FORMAN HOLT
MICHAEL E. HOLT
66 Route 17 North, First Floor
Paramus, NJ  07652
Telephone:  201/845-1000
Facsimile:  201/655-6650

*Attorneys for Charles M. Forman, Trustee*

[Additional counsel appear on signature page.]

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: OPENPEAK, INC. | ) Case No. 16-28464-SLM |
| | ) |
| Debtor. | ) Chapter 7 |
| | ) |
| CHARLES M. FORMAN, TRUSTEE, | ) Adv. Pro. No. 17-01755-SLM |
| | ) |
| Plaintiff, | ) AMENDED COMPLAINT |
| vs. | ) |
| | ) |
| DANIEL GITTLEMAN, DAVID BARCLAY, | ) |
| CHRISTOPHER HILL, HOWARD KWON, | ) |
| JOHN SCULLEY, ALEX KOMOROSKE, | ) |
| JOACHIM GFOELLER, JR., J. TOMILSON | ) |
| HILL, III, JAMES ROBINSON, IV, and | ) |
| MORTON TOPFER, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff, Charles M. Forman (the "Trustee" or "Plaintiff"), trustee for the chapter 7 estate of

OpenPeak, Inc. ("OpenPeak" or the "Company"), by and through his undersigned attorneys, makes

these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all

other matters, upon investigation of counsel:

## NATURE OF THE ACTION

1.      Plaintiff brings this action against certain former officers and directors of OpenPeak

for breach of fiduciary duty, waste of corporate assets, unjust enrichment, and fraudulent transfer.

Plaintiff, through his counsel, has conducted an investigation and based on this investigation now

seeks redress on behalf of OpenPeak and its creditors for Defendants' (defined below) improper

actions.

2.      Prior to its bankruptcy filing in 2016, OpenPeak was a private company that

developed software.  Its primary software product, ADAM, was developed to allow employees to

securely access their company workspaces on personal mobile devices.

3.      OpenPeak's failure was a direct result of wrongful conduct engaged in by its senior

officers, including Defendants Daniel Gittleman ("Gittleman"), David Barclay ("Barclay"),

Christopher Hill ("Hill") and Howard Kwon ("Kwon," together with Gittleman, Barclay and Hill,

the "Officer Defendants").  As alleged below, the Officer Defendants ran OpenPeak in an unethical

and unscrupulous manner that permeated the Company's dealings with customers, potential

acquirers and investors.  Gittleman and other Company officers, in breach of the Company's Code of

Business Ethics and their fiduciary duties owed to the OpenPeak and its stakeholders, built and ran a

company based on lies and falsehoods that ultimately became a house of cards waiting to collapse.

The Officer Defendants' wrongful actions and misrepresentations negatively impacted OpenPeak's

reputation and relationship with customers, hampered the ability of the Company and its assets to be

sold, weakened the financial condition of the Company, and caused Company stakeholders to lose millions of dollars.

4.      The Company's customers were dissatisfied and frustrated with ADAM because Defendant Gittleman and other Company officers over-hyped the ADAM software, promoted features that didn't exist, and hid fundamental flaws in the software from customers.  Gittleman put on flashy presentations to demonstrate ADAM's capabilities even though he knew it would not operate as shown if it was implemented by the customer.   Gittleman and the other Officer Defendants violated OpenPeak's Code of Business Ethics which required them to "deal fairly with the Company's customers" and exhibit the "highest ethical standards."  OpenPeak's inability to deliver products as falsely promised caused customers to cancel contracts and harmed the Company.

5.      Since the Company failed to generate meaningful revenues from its products, OpenPeak needed to continually seek capital from investors, raising over $120 million between 2011 and 2016.  To encourage investments, the Officer Defendants falsely represented to existing and potential stakeholders that the ADAM product was doing well and was widely adopted by customers, misrepresented OpenPeak's financial results to make the Company look more attractive, and issued financial forecasts reflecting exponential growth which were not based on realistic assumptions.   Contrary to the Officer Defendants' positive statements, the ADAM product was plagued with structural and fundamental problems that were extremely difficult to fix, the product was not scalable, its largest business development customers, AT&T and Blackberry Corporation ("Blackberry"), were dissatisfied with the product, and even though OpenPeak had provided hundreds of thousands of licenses to potential customers, only a minuscule percentage of the licenses were ever activated by end-users.  The Officer Defendants also represented that the Company's

intellectual property assets were worth hundreds of millions of dollars when in actuality they were worth much less.

6.       The Officer Defendants attempted to entice potential acquirers by withholding full and accurate information about OpenPeak at the beginning of the sales process.  Once those potential suitors performed due diligence, however, they learned the truth about the weaknesses in OpenPeak's business.  Rather than offer less money for the Company, at least two companies that were initially interested walked away from negotiations as a result of the credibility problems caused by the Officer Defendants' deceptions.

7.       At the same time OpenPeak struggled to generate meaningful revenues and to pay basic corporate expenses, Gittleman and the Officer Defendants treated the Company as their personal piggy bank and wasted corporate assets to benefit themselves to the detriment of the Company.  Gittleman and the other Officer Defendants took money out of the Company that was never repaid, drew excessive salaries, and caused OpenPeak to fund their luxurious lifestyles.  For example, Gittleman traveled by private jet, stayed in hotel rooms costing $10,000 a night, charged the Company tens of thousands of dollars to hold meetings at his house, used his Company credit cards to purchase non-business related items, and caused the Company to pay large salaries to his friends and incur other unnecessary costs to develop a product that was abandoned by the Company.

8.       The breaches of fiduciary duty and wrongful conduct of the Officer Defendants could not have occurred for as long – or even at all – without the complicity of OpenPeak's Board of Directors (the "Board").  The Board, tasked with overseeing the managers of the Company, failed to reign in their reckless and wasteful behavior or ensure they operated OpenPeak in an effective manner.  In fact, the Board enabled their harmful conduct by repeatedly approving Gittleman's requests for the Company to incur more debt, kept their heads in the sand, and served as a

rubberstamp to the whims of the Officer Defendants. The Officer Defendants would not have been able to so extensively misuse Company funds had the Director Defendants not abdicated their fiduciary obligations to OpenPeak and its stakeholders.

9.    During 2014 and early 2015, it was clear that ADAM was fundamentally flawed, OpenPeak was insolvent, and the Company was unable to generate meaningful revenue to satisfy its debts. In the fulfillment of their fiduciary duties, the Board should have sought to protect the interests of the Company and its stakeholders, which at the time were OpenPeak's creditors due to the Company's insolvency. Instead of pursuing a restructuring or bankruptcy filing to try to salvage the Company's assets, the Board acted in its own interest, and in the interest of the Officer Defendants, by enabling OpenPeak to issue substantially more debt and further dilute the existing stakeholders. During 2015, the Board permitted OpenPeak's outstanding debt to dramatically increase from $26 million to more than $102 million.

10.    As OpenPeak's problems continued and worsened into 2016, the Officer Defendants were no longer able to raise money or sell the Company, and stakeholders began to realize the extent of Defendants' deceptions. As investor Mike Perry wrote to Gittleman on February 16, 2017:

> I just [got] an email from Dr. Gorton. ***Really, and if so what happened to the management of the company. What was the board of directors doing to oversee the company. What happened to you Dan? I am shocked about what you and David [Barclay], and Howie [Kwon], represented to Susan and me at Newport Beach***. I expect a call. Every time I ask you to call you never do*. **I invested $4.5 with you. You OWE ME A CALL***!!! I know that you won't call. ***I am mad and sorry I listened and trusted you***. I know you won't call. I thought we were friends. I guess not. Thank you.[1]

11.    OpenPeak was forced to file for chapter 7 bankruptcy protection on September 27, 2016.

---

[1]    Unless otherwise noted, emphasis is added throughout.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. This is a core proceeding under 28 U.S.C. §157.  Venue of this adversary proceeding in this district is proper under 28 U.S.C. §1409(a).

## PROCEDURAL BACKGROUND

13.     On September 27, 2016, OpenPeak filed a voluntary chapter 7 petition in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").  *See In re: OpenPeak, Inc.*, No. 16-28464 (SLM) (Bankr. D.N.J.).  The same day, Charles M. Forman was appointed as Trustee.  On October 20, 2016, the Bankruptcy Court appointed LeClairRyan, P.C. as the Trustee's general bankruptcy counsel.

14.     On March 20, 2017, Robbins Geller Rudman & Dowd LLP was appointed special litigation counsel to the Trustee to investigate and pursue, if appropriate, potential claims or causes of action against the former directors, officers and employees of OpenPeak.

15.     On July 7, 2017, the Bankruptcy Court entered an order granting the substitution of counsel from LeClairRyan, P.C. to Forman Holt, since the attorney acting as general bankruptcy counsel to the Trustee changed firms.

## BASIS OF ALLEGATIONS

16.     The allegations herein are based upon an investigation conducted by, and under the supervision of, Plaintiff's counsel.  This investigation included examining and analyzing information obtained from numerous public and proprietary sources – including, *inter alia*, court filings related to the Company and Defendants, publicly available reports, press releases, published interviews, news articles and other media reports (whether disseminated in print or by electronic media), and a

review and analysis of internal OpenPeak documents and communications[2] involving former

OpenPeak employees and directors.

17.    Additionally, Plaintiff's counsel conducted discovery pursuant to Fed. R. Bankr. P.

2004 involving former employees, officers, directors, investors, customers, and professional service

providers of OpenPeak.  Finally, in the course of Plaintiff's counsel's ongoing investigation, former

OpenPeak employees and investors who possessed direct knowledge of the wrongdoing alleged

herein were interviewed.

### THE PARTIES

18.    Plaintiff Charles M. Forman is the Trustee of the OpenPeak's chapter 7 estate.  His

address is Forman Holt, 66 Route 17 North, Paramus, New Jersey 07652.

19.    Defendant Daniel Gittleman was, at all relevant times herein, the Chief Executive

Officer ("CEO") and Chairman of the Board of OpenPeak.  As of June 2016, Gittleman held 887,305

shares of OpenPeak Common Stock, accounting for 8.32% of all outstanding shares.   Upon

information and belief, Gittleman is a resident of Florida.

20.    Defendant David Barclay was, at all relevant times herein, the Executive Vice

President of Strategy & Business Development of OpenPeak, and served as *de facto* Chief Financial

---

[2]    Dynamic Network Support ("DNS"), a Florida based IT firm, assisted in recovering and accessing OpenPeak's electronically stored documents.  Over the course of its engagement, DNS learned that important servers were inexplicably missing from OpenPeak's Headquarters.  Of the servers that remained, DNS was only able to fully retrieve information from one because the passwords provided by OpenPeak IT personnel, including the head of Management Technology, Lee Westenberger, did not work.  Even though DNS was unable to fully access other servers it was able to determine that many had been wiped or resurfaced entirely, destroying any information that had existed.   Among other things, all emails for the Officer Defendants and all other OpenPeak employees prior to February 2016, as well as Company documents that resided on the Company's servers, were missing.

Officer ("CFO"), starting in July 2013.  Upon information and belief, Barclay is a resident of Washington State.

21.     Defendant Christopher Hill joined OpenPeak as its first President on April 1, 2014. Prior to joining OpenPeak, Hill was the Senior Vice President of Advanced Solutions for AT&T Business, where he worked directly with OpenPeak.  Upon information and belief, Hill is a resident of New Jersey.

22.     Defendant Howard Kwon was, at all relevant times herein, the Vice President and General Counsel of OpenPeak.  As of June 2016, Kwon held 173,831 shares of Common Stock. Upon information and belief, Kwon is a resident of Florida.

23.     Defendant John Sculley ("Sculley") served as a member of the Board until 2015. Sculley was the Vice President (1970–1977) and President (1977–1983) of Pepsi-Cola, until he became CEO of Apple Inc. on April 8, 1983, a position he held until 1993.  Since 1993, he has been involved in various start-up companies.  Upon information and belief, Sculley is a resident of Florida.

24.     Defendant J. Tomilson Hill, III ("J.T. Hill") was, at all relevant times herein, a member of the Board.  J.T. Hill is currently the Vice Chairman of the Blackstone Group, and President and CEO of Blackstone Alternative Asset Management, the firm's hedge funds business. He sits on Blackstone Group's Management and Executive Committees, and is also a member of its board of directors.  As of June 2016, J.T. Hill held 27,544 shares of Preferred Series 2 Stock.  Upon information and belief, J.T. Hill is a resident of New York.

25.     Defendant Morton Topfer ("Topfer") was, at all relevant times herein, a member of the Board.  Since 2000, Topfer has served as the Co-Founder and Managing Director at Castletop Capital.  He worked at Dell Computer Corporation from 1994 to 2002 as Counselor to Dell's CEO.

Prior to Dell, he worked at Motorola Inc. for 23 years. As of June 2016, Topfer held 921,712 shares of Common Stock and 111,485 shares of Preferred Series 2 Stock in OpenPeak. Topfer's firm, Castletop Capital, as of June 2016, held 75,822 shares of Common Stock. Upon information and belief, Topfer is a resident of Texas.

26.      Defendant Alex Komoroske ("Komoroske") was, at all relevant times herein, a member of the Board. Komoroske is currently the Managing Director of Ritchie Capital Management, a position he has held since September 2002. Prior to working at Ritchie Capital Management, he was the Managing Director at Motorola Ventures. Komoroske's firm, Ritchie Capital Management, through Ritchie Long Short Trading, Ltd., held 213,327 shares of Common Stock in OpenPeak. Upon information and belief, Komoroske is a resident of California.

27.      Defendant Joachim Gfoeller, Jr. ("Gfoeller") was, at all relevant times herein, a member of the Board. He was the Managing General Partner at GMG Capital Partners L.P. As of June 2016, his firm, GMG Capital Partners L.P., through GMG Capital Partners III, L.P., held 1,014,863 shares of Common Stock. Upon information and belief, Gfoeller is a resident of Ohio.

28.      Defendant James Robinson, IV ("Robinson") was, at all relevant times herein, a member of the Board. Robinson is the Co-Founder and Managing Partner of RRE Ventures. Prior to founding RRE Ventures in 1994, Robinson worked at Hambrecht & Quist and J.P. Morgan & Co. Robinson's firm, RRE Ventures, through various investment vehicles, as of June 2016, owned 878,104 shares of Common Stock and 152,715 shares of Series 2 Preferred Stock. Upon information and belief, Robinson is a resident of New York.

29.      Defendants Gittleman, Sculley, Komoroske, Gfoeller, J.T. Hill, Robinson and Topfer are collectively referred to herein as "Directors" or "Director Defendants," and together with the Officer Defendants, as "Defendants."

## DEFENDANTS' DUTIES

30.    To fulfill their fiduciary duties, Defendants were required to exercise reasonable and prudent supervision over OpenPeak and its policies, practices, controls, and financial affairs pursuant to their fiduciary obligations to use the same care and diligence as would an ordinary prudent person in a similar position.

31.    By virtue of these obligations, the Defendants were required, among other things, to:

(a)    act in the best interests of OpenPeak;

(b)    operate OpenPeak in such a manner as to utilize the resources of the Company in a way which benefits OpenPeak, and not the personal interests or preferences of the Defendants;

(c)    refrain from abusing their positions of control;

(d)    not favor their own interests at the expense of OpenPeak;

(e)    in good faith, manage, conduct, supervise, and direct the business and affairs of OpenPeak carefully and prudently in accordance with United States federal and state laws;

(f)    accurately disseminate information to shareholders and creditors;

(g)    exercise reasonable control and supervision over all employees of OpenPeak;

(h)    ensure that OpenPeak did not engage in unlawful, unsafe, imprudent or unsound practices, and remain informed as to how OpenPeak was, in fact, operating; and

(i)    upon receiving notice or information of an unlawful, unsafe, imprudent or unsound practice, to make a reasonable investigation in connection therewith and to take steps to correct that practice.

32.    By reason of their positions as Directors and officers, and their ability to dominate and control OpenPeak's business and corporate affairs, the Defendants owed OpenPeak obligations of candor, fair disclosure, care, fidelity, trust and loyalty, and were required to use their ability to

control OpenPeak in a fair, just and equitable manner, as well as to act in furtherance of OpenPeak's and its stakeholders' best interests or preferences.

33.    In addition, each Defendant owed OpenPeak the duty to exercise care and diligence in the management and administration of OpenPeak's affairs and in the use and preservation of its property and assets.

## SUBSTANTIVE ALLEGATIONS

**A.  The Company**

34.    OpenPeak was founded in 2002 by Defendant Gittleman and initially focused on home and office automation and IP video conferencing, and later transitioned into producing other hardware products, including tablets.  Over time, OpenPeak expanded its Board to include the Director Defendants who have strong, well-known reputations in the technology and finance spaces. In his efforts to raise money, Gittleman marketed the reputations of the Directors in order to give comfort to investors that OpenPeak was being run by reliable and trustworthy people.

35.    By January 2012, OpenPeak abandoned its hardware business and focused on developing software for its ADAM platform, which was a program intended to allow an employee to securely access his or her company workspace on a personal mobile device.

36.    ADAM was comprised of four components: (a) Sanction, a device management program with features such as the remote wiping of data and location tracking; (b) Sector, a virtual workplace, which separated work and personal data, and provided functions such as email, calendar and contacts; (c) OpenShop, an application store, where ADAM safe applications were available for download; and (d) Analytics, for the monitoring and reporting of all managed devices and applications.

37.    All OpenPeak employees, including the Defendants, were governed by a Code of Business Ethics, which required them to "exhibit the highest ethical standards."  The Code of

Business Ethics mandated that Company property "must not be used for improper personal benefit or any other improper purpose." It further required that, "Company business records must always be prepared accurately and reliably" and that records were to be "kept in accordance with accepted accounting rules and controls at all times." Additionally, it required fair dealing, and provided that, "[n]o employee, officer, or director should take unfair advantage of anyone through manipulation, concealment, misuse of privileged or proprietary information, misrepresentation of material facts, or any other intentional unfair-dealing practice." As alleged below, the Officer Defendants repeatedly violated the Code of Business Ethics resulting in harm to the Company and its stakeholders.

**B. OpenPeak Depended upon Other People's Money**

38. Since OpenPeak never had a product which generated meaningful revenue, it depended upon outside funding to support its operations.

39. Between March 2011 and December 2015, OpenPeak borrowed over $120 million from investors. The chart below lists OpenPeak's debt raises:

| Start Date | End Date | Type | Amount | Total to Date |
|---|---|---|---|---|
| 3/1/2011 | 4/19/2011 | 10% Convertible Secured Promissory Notes, Series E | $29,841,562.00 | $29,841,562.00 |
| 3/13/2012 | 7/30/2012 | Convertible Secured Promissory Notes, Series E | $10,260,077.00 | $40,101,639.00 |
| 3/30/2012 | 3/30/2012 | Secured Hercules Loan | $15,000,000.00 | $55,101,639.00 |
| 1/11/2013 | 1/14/2013 | 5% Convertible Promissory Notes, Series E | $575,344.53 | $55,676,983.53 |
| 1/11/2013 | 1/15/2013 | 7.5% Convertible Promissory Notes, Series E | $139,409.00 | $55,816,392.53 |
| 1/24/2013 | 11/15/2013 | 5% Convertible Promissory Notes due 2014, Series B | $19,593,128.00 | $75,409,520.53 |
| 9/27/2013 | 9/27/2013 | 5% Convertible Promissory Notes due 2014, Series BB | $5,000,000.00 | $80,409,520.53 |
| 3/5/2014 | 3/5/2014 | Hercules Investment to Repay the Initial Loan and Provide Additional Capital | $11,000,000.00 | $91,409,520.53 |
| 10/30/2014 | 10/30/2014 | Second Tranche of Secured Hercules Loan Funded | $4,500,000.00 | $95,909,520.53 |
| 1/13/2015 | 12/4/2015 | 10% Subordinated Debt Notes | $26,277,864.00 | $122,187,384.53 |

40.     OpenPeak's outstanding debt increased dramatically beginning in 2014.  As set forth in the graph below, which tracks OpenPeak's debt between March 2014 and September 2016, the Company's outstanding debt increased from $17 million in June 2014 to $26 million in December 2014 and then exploded to $102.4 million by December 2015:[3]



41.     Even though Defendant Gittleman was the primary fundraiser for the Company, he could not have raised such large amounts of money without the approval and cooperation of the Board.  Between 2013 and 2016, Gittleman repeatedly asked the Board to approve his requests to raise money from investors and take on more debt.  Even though the members of the Board knew about OpenPeak's financial problems and the detrimental effect additional debt would have on OpenPeak and its existing creditors, the Board, in breach of their fiduciary duties, served as a rubberstamp for Gittleman's requests.

---

[3]      In 2015, OpenPeak issued over $26.2 million in 10% Subordinated Debt Notes.  The notes were subordinate only to Hercules Capital Inc.'s debt of $12.5 million and provided for the return of the initial investment plus 10% interest in addition to another payment of at least double the initial investment.  In total, the 10% Subordinated Debt Notes represented approximately $81.4 million of OpenPeak's debt.

42.    The Board granted over 10 requests for permission to raise capital, including:

(a)    January 9, 2013: The Board agreed to a first bridge loan financing.

(b)    January 17, 2013: The Board approved a second bridge loan financing in an amount of $7.4 million.  Gittleman indicated that OpenPeak needed $2.4 million to meet its cash needs *for the month of January 2013 alone*.

(c)    March 28, 2013: The Board raised the authorized cap of the second bridge loan financing to $14 million.

(d)    July 8, 2013: The Board raised the authorized cap of the second bridge loan financing to $18 million.  Gittleman explained that OpenPeak needed about $850,000 to make payroll *that week*.

(e)    September 24, 2013: The Board raised the authorized cap of the second bridge loan financing to $21 million.

(f)    January 12, 2015: The Board approved the issuance of 10% Subordinate Debt Notes in an aggregate principle amount of up to $10 million.  Gittleman raised concerns about OpenPeak's financial condition.

(g)    January 29, 2015: The Board approved Gittleman's request to increase the cap on the issuance of 10% Subordinate Debt Notes up to $15 million.  This was roughly two weeks after the previous cap raise.

(h)    April 15, 2015: The Board approved raising the cap on the 10% Subordinate Debt Notes to $20 million.

(i)    July 28, 2015: The Board approved raising the cap on the 10% Subordinate Debt Notes to $25 million.  Gittleman raised OpenPeak's continued capital problems.

(j)    September 30, 2015: The Board approved raising the cap on the 10%
Subordinate Debt Notes to $27.5 million.  Gittleman raised OpenPeak's continued capital problems.

43.    The Director Defendants did nothing to reign in the wasteful spending by the Officer
Defendants.  Additionally, once OpenPeak became insolvent, the Defendants were required to act in
the best interests of the creditors.  The Defendants, however, ignored their fiduciary duties and
burdened the Company with more and more debt until they were unable to identify any interested
investors.  As alleged below, even after it was clear that OpenPeak had become insolvent because
ADAM had fundamental problems, there was no reasonable prospect that OpenPeak could
successfully continue in the face thereof, and OpenPeak took on additional debt and was unable to
meet maturing obligations as they fell due in the ordinary course of business, Gittleman and the other
Officer Defendants sought to issue more debt to benefit themselves to the detriment of the Company
and its stakeholders.

**C.  OpenPeak and Its ADAM Product Experienced Severe Problems**

44.    Defendant Gittleman and the other Officer Defendants enticed investors by
misrepresenting facts and omitting material information about OpenPeak and its ADAM product.
Defendants Gittleman and Barclay repeatedly communicated overly positive and optimistic
statements about the success of ADAM, demand by customers, and expected revenues.  Contrary to
their statements, however, ADAM suffered from substantial functionality problems.

45.    At the same time that Defendant Gittleman was praising the ADAM product,
OpenPeak was receiving poor reviews of that product from customers and employees.  The problems
were so bad that, at the end of 2013, OpenPeak scraped the then current version of ADAM, which
was written in the programming language known as Java, and replaced it with a version programmed
in the PHP language.  Thus, at the end of 2013, OpenPeak wrote down the full value of the Java
version of ADAM to zero.  (*See infra* ¶¶80-86).

46.      But the PHP version of ADAM fared no better than the prior Java version.  According to several former OpenPeak employees, the ADAM program continued to experience fundamental problems between 2014 and 2016.

47.      Employees recalled that: (a) OpenPeak products contained numerous bugs and did not work as intended, leading to poor sales and the loss of customers; (b) the Company's officers were not interested in the long-term functionality of ADAM – they simply wanted to be able to demo the product to customers; and (c) the Company's officers ignored concerns raised by Company employees regarding ADAM.

48.      Defendant Gittleman and the other Officer Defendants misrepresented facts about ADAM to potential business partners in an effort to sell their products.  Gittleman misrepresented to potential customers how well ADAM worked and falsely represented that the product had features which did not exist.  When Gittleman returned to the office after a sales call, he instructed employees to create features within unrealistic time frames.  Former employees also believed that Gittleman and OpenPeak over-promised and under-delivered to customers and provided a product that was often rushed to market without the proper testing or without fixing known problems.

49.      Due to the widespread problems with ADAM since the beginning of its development, OpenPeak was unsuccessful.  AT&T, OpenPeak's largest customer, experienced numerous problems and communicated complaints directly to OpenPeak's officers.  Even though OpenPeak may have provided licenses to customers, OpenPeak only generated revenue when licenses were activated, and only a very small percentage of licenses were ever activated.  For example, even though OpenPeak provided AT&T with more than 100,000 licenses, by June 2014, AT&T's version of ADAM, named Toggle, only had approximately 154 active users.  (*See infra* ¶¶89-98).

50.    BlackBerry, another important OpenPeak customer, had similar problems with ADAM.  During 2014 and 2015, Blackberry had an ongoing dispute with OpenPeak and claimed that OpenPeak was in breach of their agreement due to material problems with the ADAM product.

### i.    AT&T Was Dissatisfied with ADAM

51.    During 2014 and 2015, AT&T's management team communicated its concerns about Toggle to OpenPeak's officers.

52.    Despite the positive reports provided to OpenPeak stakeholders, AT&T voiced concerns about the following, among other things: (a) the product would crash, despite the low active user count; (b) the product would not sync with other devices or programs; (c) the product was not evolving or progressing over time; (d) due to the problems, the product was not ready for distribution; and (e) due to the problems, OpenPeak was losing customers.

53.    Some of these communications are described below:

(a)    On February 27, 2014, Daniel Walsh, Senior Vice President of Global Customer Solutions and Integration at AT&T, emailed Defendant Hill, who still worked at AT&T, and others, stating, "***Toggle has crashed on me every day this week (iPhone and iPad).  IT trying to figure it out . . . have wiped and reloaded several times***."  He concluded the email with "no immediate fix in sight."  Hill forwarded the email to Defendant Gittleman, who responded that it "sounds like an issue we had a long time ago. . . ."

(b)    On or about March 24, 2014, Walt M. Rivenbark IV, Assistant Vice President of Big Data Solution Sales & Marketing at AT&T, circulated internally at AT&T, a summary of his trial of Toggle, during which he ***experienced problems with the program, including numerous crashes and sync issues***.  After some discussion regarding Rivenbark's experience, Vice President of IoT Solutions at AT&T Michael Troiano ("Troiano"), advised Defendant Gittleman that, "***[AT&T] had a customer cancel last week because they were [also] frustrated with synch issues***."

(c)      In an August 12, 2014 email forwarded by Defendant Gittleman to Executive Director of Integrated Solutions at AT&T Sundhar Annamalai ("Annamalai"), Philip Schntrup of OpenPeak reported on *potential customer SAP's inability to enable their product, Fiori, inside of Toggle*.  Annamalai bluntly responded to Gittleman, "I don't think we're going to be able to close on these test customers by the end of August. . . .  Good to hear on the synergies [between Fiori and Toggle], but *there is nothing to sell at this point*.  The target date was 7/31."

(d)      On August 25, 2014, Annamalai sent an email to Andy Aiello ("Aiello") of OpenPeak and Defendants Hill and Gittleman, copying others at AT&T, discussing problems with the scalability of Toggle, stating, "[t]here is *growing concern on the scalability of the product* and getting killed internally from a perception standpoint.  I don't believe OP recognizes the amount of pain AT&T is taking from the sales team, care, ITO, MSS and Internal customers with regards to the collective set of issues."

(e)      On or about September 10, 2014, Annamalai sent a scathing email to Defendant Hill (now at OpenPeak), who forwarded the email to Defendant Gittleman and Aiello. *Annamalai vividly described the sync problems he experienced while using Toggle, including that none of the actions taken on his iPhone ever took effect* – specifically, calendar updates and emails were never actually sent.  As a result, Annamalai failed to respond to important emails and attend meetings.  In summary, Annamalai stated that, "[s]everal internal users have approached me telling me they tried Toggle out, but stopped using it as they weren't 100% [confident] that emails would send or their calendars would synchronize."

(f)      On October 1, 2014, an email exchange occurred between Troiano of AT&T and Defendant Hill, in which Troiano stated he received the following message in an email: "*I am seriously losing my patience with this product. . . .*  As I said to [A]bhi the other day, *it's a GOOD*

thing we have 133 users active and not 133K.”  Troiano later replied that **AT&T** “*is growing frustrated that the product hasn’t evolved (much) this year.  Lots of promises, but it is not substantially different in Oct than it was in June. . . . You need to start asking OP some serious questions before ATT gets a big old black eye from it*.”

(g)    On October 3, 2014, an exchange of emails occurred between AT&T and OpenPeak employees, including Defendant Hill and Aiello, regarding the recent Toggle experience of Chad Tursi, an Executive Director of Enterprise Mobility Management and Collaboration at AT&T.  According to the email, Tursi was scheduled to demo Toggle for a client, when, 30 minutes prior to the demo, *his entire device was wiped out as a result of Toggle*.  Tursi, copied on the email chain, demanded an explanation from OpenPeak, and stated if he was unable to get one, he would call Gittleman himself.  Hill replied later in the thread, stating that he was “at a loss to understand what is going on with [Tursi’s] device.”

(h)    On July 15, 2015, Lloyd Silvern of OpenPeak sent an email to others at OpenPeak, commenting on the problems with Toggle, and stating, “*This is getting very urgent as ATT is communicating to their executive leadership serious problems*.  Eugenie . . . you will probably need to do some damage control.”

(i)    On August 14, 2015, Defendant Hill received a document regarding Western Kentucky University’s test of the Toggle product.  The summary, which highlighted various user experiences, trashed OpenPeak and its product.  One user even commented, “*Going forward with Toggle and rolling it out to students would be nothing short of a mistake*.  For students, Toggle is confusion, for the helpdesk, Toggle is headaches.  For IT, Toggle is a PR nightmare waiting to happen.  To put it kindly, for our intended purposes: *Toggle is garbage, Toggle should be terminated*.”

## ii. Blackberry Was Dissatisfied with ADAM

54.     Blackberry was one of OpenPeak's most important customers and contributed to a material portion of revenues in OpenPeak's financial forecasts.  Blackberry, however, was extremely unhappy with OpenPeak and ADAM.

55.     On or about October 28, 2014, Blackberry notified OpenPeak that it was in violation of the contract, and subsequent amendments, between the two parties.  In a letter to OpenPeak, Blackberry wrote, "OpenPeak has repeatedly failed and continues to fail to resolve errors, problems, defects, malfunctions, and other deficiencies in the licensed software and customized developments within the required resolution times."  Blackberry also wrote that "the licensed software and customized developments do not operate in accordance with the functional, technical, operational, performance and quality specifications, provided in the Agreement, and technical documentation."

56.     Thus, during 2014 and 2015, as OpenPeak was raising millions of dollars, unbeknownst to investors, its major customers Blackberry and AT&T were very dissatisfied.

## iii. Former OpenPeak Employees Revealed Problems with OpenPeak and ADAM

57.     According to several former OpenPeak employees, there were numerous problems with the design, development, and functionality of ADAM.  Former employees made clear that Defendant Gittleman misrepresented the functionality of ADAM to customers and represented that ADAM had features that did not exist.  Gittleman was almost exclusively focused on closing deals with customers, with utter disregard for the reality of what the software could do and irrespective of the negative business implications that would follow as a result of the technology not being able to perform as promised.  Gittleman's haphazard and reckless conduct negatively impacted the development of ADAM and contributed to OpenPeak's inability to get the software to perform correctly.  Additionally, Gittleman's conduct negatively impacted OpenPeak's reputation.

58.     Several former employees recalled that Defendant Gittleman and other Company officers would force developers to add new features into ADAM despite the fact that the developers told those officers that there were existing problems that needed to be addressed first.   The Company's officers' refusal to address existing problems compounded the issues and made them even harder to address.  This was true even for the simplest of fixes.

59.     Several former employees commented that the Company's officers were "demo driven," meaning that the officers were not concerned if a product would work in the long-term, as long as they could show a potential customer something that briefly worked.  Often times, these "demo versions" could not handle more than a few users.  As a result of Defendant Gittleman and the officers' pressure to produce these "demo versions," the Company wound up with many small pieces of a larger program that barely worked.

60.     Employees also recalled that the Company's officers, and most importantly Defendant Gittleman, would over-promise and under-deliver, such that the officers made promises about the product to customers that they knew OpenPeak could not keep.  The former employees recalled that what customers were told about the product did not match the true state of the product.

61.     Several former employees recalled their own problems with the use of the product. One stated that his or her iPhone, which contained ADAM, would lock up entirely when rebooted. Another recalled that the program was difficult to use and was not as user-friendly as the competition.

62.     Several former employees recalled that OpenPeak was unable to deliver products on time, and even when it did deliver a product, the Company's officers knew the quality was poor, and the product contained bugs.  As a result, the former employees were left to deal with angry customers who experienced the problems with the software.

63.     Numerous former employees commented that these problems caused: (a) low license activation numbers; (b) the loss of customers; and (c) the inability of OpenPeak to sell itself or its assets.

64.     One former employee specifically commented that the Officer Defendants would have been aware of problems with the program due to the large amount of complaints the Company received from AT&T and Blackberry.

65.     Former employees also commented that Defendant Gittleman was deceitful.  One former employee described Gittleman as a stereotypical shady salesman and said, "I would never trust him as far as I could throw him."

66.     Another former employee noted that Defendant Gittleman was very good at spin. Gittleman had people believing that OpenPeak was winning contracts and that the Company was growing, but according to the former employee, this was not true.  According to the same former employee, Gittleman knew about the poor performance of OpenPeak's products because that employee had numerous conversations with Gittleman about the problems.

67.     According to former employees, Defendant Gittleman focused on raising money and making promises that were extremely difficult to keep instead of helping the Company develop a product that worked.  In fact, one former employee described OpenPeak as a "ship without a rudder."  The former employee elaborated by stating that the Company's officers had no plan on how to get OpenPeak out of its then current situation, or any plan on how to make its product work.

**D.  The Officer Defendants Treated OpenPeak as Their Personal Piggy Bank**

68.     Despite the financial hardships facing OpenPeak, the problems experienced by customers, and its inability to generate any meaningful revenue, Defendant Gittleman and the other Officer Defendants wasted corporate assets and unjustly enriched themselves, as they enjoyed lavish lifestyles funded at the Company's expense.

69.     Defendant Gittleman (and others), drew very large salaries, flew on private charter jets, stayed at extremely expensive hotels, and used company assets to buy non-work related gifts for himself and a select group of employees.  Gittleman recklessly spent OpenPeak's money on himself and those close to him, with utter disregard for what was in the best interest of the Company.  Much of this wrongful conduct occurred within the two years preceding OpenPeak's bankruptcy.

70.     Defendants Gittleman, Kwon, Barclay and Hill were able to fuel their extravagant lifestyles, in part, based on the large salaries they drew from OpenPeak.  Despite all the problems at OpenPeak, including never having a truly functional product, between 2012 and 2016, the four drew collective salaries of $6.98 million.

71.     Specifically, during 2015, as the Company was asking stakeholders to invest more money to keep the Company afloat, and customers were constantly complaining about ADAM, the four drew salaries in excess of $1.6 million.  To this end, Defendants Gittleman and Hill collected $475,000, Defendant Kwon collected $360,000 and Defendant Barclay collected $350,000.  The Officer Defendants were paid similar amounts for part of 2016.

72.     Additionally, Defendants Gittleman and Kwon received loans from the Company that were not repaid.  On September 22, 2008, OpenPeak issued a Full-Recourse Promissory Note to Gittleman in the amount of $199,864.67.  Then, on September 22, 2013, OpenPeak issued Full-Recourse Promissory Notes to both Gittleman and Kwon in the amounts of $130,342.40 and $72,282.64, respectively.  The Trustee is entitled to recover the full, unpaid amounts of all such loans as outstanding receivables owed to the Company.

73.     Further, according to a former investor in OpenPeak, Defendant Gittleman would spend as much as $75,000 on a villa at the MGM Mansion in Las Vegas during the Consumer Electronic Show ("CES"), which he traveled to by private jet and attended each year.  The MGM

Mansion is reserved for the "highest of rollers" and has 29 individually designed Mediterranean themed villas ranging from 2,400 square feet to 12,000 square feet. Even though the villa could accommodate numerous guests, only Gittleman and his secretary, Stacey Bradford, would stay there.

74.    Defendant Gittleman caused OpenPeak to waste additional money on separate rooms for other OpenPeak employees in the regular portion of the MGM hotel. According to a former employee, this was typical of Gittleman's spending at CES until at least 2015.

75.    At a Board meeting on January 17, 2013, around the time of CES that year, Defendant Gittleman reported that even though the prior week the Company had raised $714,000, the Company still needed to raise an additional $2.4 million "to meet additional cash demands for the rest of the month of January 2013." At the same time as the Company was in dire need of cash, Gittleman needlessly spent hundreds of thousands of dollars on himself so he could travel in extravagant fashion. The Board sat idly by, in breach of their fiduciary duties, as this wasteful spending occurred and approved Gittleman's requests for additional capital without regard to the negative impact on the Company or its stakeholders.

76.    In addition to wasting corporate assets by causing OpenPeak to fund his extravagant lifestyle, Defendant Gittleman caused the Company to spend money, needlessly, on corporate projects and salaries. For example, by the beginning of 2014, OpenPeak had already abandoned the Java version of ADAM for the PHP version. Nevertheless, Gittleman continued to waste money on the development of the Java version and paid employees who were his friends to work on that project, even though it was not for a legitimate business purpose. Former employees could not understand any legitimate reason why Gittleman was still putting resources into the Java version. According to one former employee, there was a group of employees who were close to Gittleman who were being paid but served no real function. This continued through at least 2015.

77.    Wasteful spending included, without limitation:

(a)    Flights on private jets for the Company's officers.    According to former employees, prior to 2014, Defendant Gittleman frequently flew on private jets for all his travel needs with costs in the hundreds of thousands of dollars.    Gittleman spent in excess of $654,000 on over 30 private charters between January 2012 and January 2013 alone.    Each trip averaged in cost from $15,000 to $22,000.    On several occasions, including flights on March 4, 2012, March 10, 2012, July 22, 2012, and October 21, 2012, Gittleman traveled with family members, including his parents, children and ex-wife.    On other occasions, including flights on April 21, 2012, May 11, 2012, September 5, 2012, September 11, 2012, September 12, 2012, October 7, 2012, October 28, 2012 and October 31, 2012, Gittleman chartered a plane for eight passengers even though he traveled alone with only his secretary, Stacey Bradford.

(b)    The Company's officers used their American Express cards to fund personal, non-business related expenses.    From at least 2012 through OpenPeak's bankruptcy in 2016, they caused OpenPeak to fund tens of thousands of dollars in personal expenses on things such as entertainment (*i.e.*, movie, concert and theater tickets, trips to Disneyland and Legoland, country club memberships, and other activities), personal needs (*i.e.*, groceries, clothing, shoes and items ordered from Amazon), heath-care needs (*i.e.*, gym memberships, spa treatments, shaving club memberships and medical bills), and other non-work related expenses (*i.e.*, items from Tiffany & Co. and items from various mail order retailers).    In fact, in 2012, Defendant Gittleman caused OpenPeak to spend over $5,000 on fireworks in the days leading up to the Fourth of July.    Defendant Gittleman's monthly American Express charges regularly exceeded $50,000 and exceeded $100,000 on numerous occasions.    Defendant Gittleman's secretary, Stacey Bradford, made similar personal purchases on an American Express credit card linked to Gittleman's account.

(c)      The Company's officers caused OpenPeak to loan them money, in amounts between $100,000 and $200,000, and had the Company forgive the debt without the officer making any payments.

(d)      Defendant Gittleman held Company meetings at his residence and charged the Company thousands of dollars.

(e)      Defendant Gittleman bought approximately fifteen Apple Watches for members of his inner circle at the Company, including the front desk receptionist, with Company funds. The watches ranged in price from $450 to $750, and served no legitimate business purpose.

(f)      The Company had a surplus of high-tech gadgets that went unused. For example, OpenPeak's headquarters had an office-sized supply closet filled with large screen TVs, computers, and a pool table, which appeared to be purchased and forgotten about.

78.     In early 2015, OpenPeak's largest secured creditor, Hercules Capital Inc. ("Hercules"), retained The Durkin Group to conduct a field audit of OpenPeak. The Durkin Group commented on OpenPeak's wasteful spending. In a February 3, 2015 email from Tamara Herder of The Durkin Group to Mark Roesler of Hercules, Herder reported that OpenPeak had a "total of 165 employees. Review of the 3-months ended 12/31/14 disbursements journal noted $5,400M in payroll disbursements. This seemed huge for only 165 employees." In an internal Hercules email dated February 4, 2015, one employee commented that, with respect to "[p]ayroll [] these folks have 6 people that make in excess of $300K [. . .](top 2 make $475K each and 4 more make $300K to $350K each). . .they pay $110k per month on the building in Boca . . . nice but half empty."

79.     The Officer Defendants' wasteful and reckless spending contributed to OpenPeak's financial problems leading to its bankruptcy.

**E.  OpenPeak Determines the ADAM Java Software Is Worthless in 2013**

80.    OpenPeak's financial statements for the year ended December 31, 2013 (the "2013 Financial Statements") were audited and represented to have been prepared in accordance with accounting principles generally accepted in the U.S. ("GAAP").

81.    The 2013 Financial Statements included disclosures about OpenPeak's "capitalized software development costs."  Generally, GAAP requires that the cost of software intended to be sold, leased or marketed be expensed as incurred until the "technological feasibility" of the software product has been established.  Once the software's technological feasibility has been established and determined, the costs of coding and testing, as well as other costs of producing product masters, are to be capitalized, *i.e.*, reported as an asset, and amortized over the greater of: (a) the straight-line basis of the product's estimated useful life; or (b) the percent of the product's current-year revenues as compared to the product's anticipated future revenues.  The capitalization of such costs are to cease when the software product is available for general release to the customer.

82.    In addition, GAAP provides that capitalized software costs are to be evaluated for impairment on a product-by-product basis by comparing a product's unamortized capitalized costs to its "net realizable value," defined in GAAP as being the product's estimated selling price in the ordinary course of business, less reasonably predictable costs of completion and disposal.  The amount by which the unamortized capitalized costs exceed the net realizable value is to be recognized as an impairment charge.

83.    The 2013 Financial Statements revealed that during 2013, OpenPeak concluded that the ADAM software was worthless, in that the net realizable value (the estimated selling price in the

ordinary course of business, less reasonably predictable costs of completion and disposal) was zero.[4]

The 2013 Financial Statements disclose, in pertinent part, as follows:

### Capitalized software development costs

During January 2011, management determined it had established the technological feasibility of its ADAM software and began to capitalize related research and development costs which included salaries, employee benefits, consulting and other costs directly related to programming and testing activities, and allocated amounts of certain indirect costs such as rent expense. During March 2012, the Company ceased capitalizing such costs when the software was available for sale to customers and began amortizing the capitalized cost of an expected period of benefit of 3 years. During 2013, the Company did not sell or license any of its ADAM software application so the Company redeveloped the ADAM software application in order to meet current market and technology demands. As a result, **management determined that the carrying value of the capitalized ADAM costs was impaired because the estimated future net realizable value related to this initial version of ADAM would not be recovered during the estimated period of benefit, and recognized an impairment charge in the accompanying statements of operations of approximately $4,100,000 during the year ended December 31, 2013, which was included in operating expenses**.

Capitalized software development costs consisted of the following at December 31, 2013 and 2012:

|  | 2013 | 2012 |
|---|---|---|
| Gross carrying amount | $ 9,637,692 | $ 9,631,817 |
| Less: accumulated amortization | (5,547,398) | (2,377,454) |
| Less: impairment | (4,090,294) | - |
|  | $ - | $ 7,254,363 |

Amortization expense during the years ended December 31, 2013 and 2012 was approximately $3,170,000 and $2,377,000, respectively, and was included in research and development expenses in the accompanying statement of operations.

84.   The Company's write-down of the entire balance of its capitalized software

development costs coincided with changing ADAM from the programming language of Java to the

programming language of PHP. The change was internally justified on the basis of keeping current

---

[4]   OpenPeak's unaudited financial records reveal that the Company's capitalized software costs totaled $4.2 million and $0 as of November 30, 2013 and December 31, 2013, respectively. Accordingly, the impairment charge was recorded in December 2013.

with the industry, but former employees disputed this justification.  The change, however, did not improve the performance of ADAM since the PHP version also had fundamental problems that rendered it inoperable.

85.     One former employee recalled that the PHP version of ADAM was created in a rush and was not stable, but became OpenPeak's main product.  Several OpenPeak employees disagreed with the change, felt the project was being mismanaged, and, as a result, expressed their concerns to OpenPeak's officers.

86.     By this point, OpenPeak's financial condition was extremely weak, the Company was insolvent, and the situation even worsened throughout 2014 and 2015.[5]  OpenPeak had abandoned the ADAM product coded in Java and the PHP version did not function adequately.  OpenPeak's assets were below liabilities, OpenPeak's asset deficiency, meaning the difference between liabilities and assets, began to grow, and OpenPeak was unable to meet debt obligations without raising additional capital.[6]  The rapid growth of OpenPeak's asset deficiency is set forth in the graph below:

---

[5]     Gittleman, Barclay, and Kwon have admitted that OpenPeak was insolvent throughout 2014 and 2015.

[6]     According to Delaware case law, "[i]nsolvency may be demonstrated by either showing (1) 'a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof,' or (2) 'an inability to meet maturing obligations as they fall due in the ordinary course of business.'" *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, C.A. No. 1456-N, 2006 Del. Ch. LEXIS 164, at *46-*48 (Del. Ch. Sept. 1, 2006) (citations omitted).



**F. The Officer Defendants Misrepresented Facts to Stakeholders and Investors and Breached Their Duty of Candor**

87.     The Officer Defendants repeatedly mispresented facts to investors regarding OpenPeak's business, financial condition, projections, customers' views of OpenPeak's products, and OpenPeak's ability to sell the business or its assets.  These misrepresentations constitute breaches of fiduciary duty and harmed the Company and its stakeholders.

88.     Defendant Gittleman consistently made OpenPeak and its products sound much better than they really were, greatly exaggerated the performance of the Company and the adoption of ADAM, and mischaracterized the likelihood that the Company could easily be sold for hundreds of millions of dollars.

**i.     Misrepresentations Regarding the Adoption of ADAM and Related Potential Revenue**

89.     The Officer Defendants grossly overstated the popularity and utilization of OpenPeak's products as well as the financial projections that flowed from the adoption of OpenPeak's technology.

90.    In order to portray OpenPeak in a positive light to investors, Defendant Gittleman

stressed the number of licenses which were transferred to customers, such as AT&T, which made it

appear as though the Company was doing well and that there was strong demand for ADAM.  This

was misleading, however, because even though a large number of licenses were transferred, only a

small portion of those licenses were activated.  Thus, the number of active users of the software was

a tiny fraction of the total number of transferred licenses, and demand was much weaker than

represented.

91.    Furthermore, regardless of how many licenses were transferred (or sold), OpenPeak

would only generate revenue when licenses were activated.  Nevertheless, in an effort to confuse

investors, Gittleman and the other Officer Defendants sometimes referred to transferred licenses as

being sold, even though those licenses were not activated.  As one former employee noted, there was

gamesmanship surrounding the use of the terms "license" and "active user" as well as with the

accounting for the sale of a license.  According to this former employee, the sale of a license was not

reflective of a user of a license.  OpenPeak could sell a customer one thousand licenses, but that did

not mean that the customer had one thousand people using the product.  In fact, the customer may

have had only two people using the product, merely for testing purposes.

92.    For example, on or about December 18, 2014, Defendant Gittleman communicated to

an investor that AT&T had signed contracts for 1,000,000 licenses, and that the largest client for

Toggle thus far was Home Depot, with 150,000 licenses.  This was misleading because Gittleman

failed to disclose that active users were a different metric than the numbers of licenses provided to

customers and that active users were essentially non-existent.  In fact, the day before, in a December

17, 2014 email from Mel Richardson of AT&T to Defendants Barclay and Hill, Richardson reported

that, "[a]s of the end of June we had 154 active users.  As of the end of September we had 296 active

users.  Therefore the net new users for 3Q2014 was 142."

93.     On January 13, 2014, Defendant Barclay emailed investor Hercules concerning

OpenPeak's December 2013 launch of the latest version of Toggle and falsely stated that, "it is

already off to an amazing start.  It was clear this week that Toggle has become the core of . . .

[AT&T's] enterprise mobility strategy."  He added that the latest version of Toggle allowed for a

"secondary voice line for business use as well as bill[ed] all business data traffic directly to the

enterprise.  This is a game changer for AT&T and none of our competitors can do this!!!"  The email

also touted that "AT&T, Blackberry and Deutsche Telekom have all adopted [OpenPeak's Sector

ecosystem] as the standard for enterprise mobile security."

94.     Defendant Barclay's January 13, 2014 statements were misleading because Toggle

had not become the "core" of AT&T's strategy and the identified companies had not adopted the

Sector ecosystem as the standard for their enterprise mobile security.  To the contrary, OpenPeak's

customers had experienced major problems with ADAM, including AT&T, who experienced

problems with Toggle's split-billing feature and Blackberry, who experienced similar problems.  In

fact, during sworn deposition testimony regarding this document, Barclay could not remember if

Toggle was even usable at this time.

95.     Defendant Gittleman sent a similar email to another investor the following day,

reiterating that Toggle was the core of AT&T's enterprise mobility strategy and adding that all of

OpenPeak's "major partners have now completed their full launch of the products in late Q4 and we

are already seeing growing pipelines, customer wins and revenue."  This email was misleading for

the same reasons identified above.

96.     On April 28, 2014, Defendant Barclay represented by email to April Young of Hercules that, "revenue from AT&T and BlackBerry have been going fantastic!"  This was misleading for the same reasons identified above.

97.     On October 8, 2015, Defendant Barclay emailed an investor regarding a deal with the United States Marine Corps, stating, in pertinent part, "Last week [OpenPeak] also closed a huge deal with the U.S Marine Corp[s] as the platform to deliver secure applications and data to up to 300K personnel."  This was misleading because, in reality, the USMC simply agreed to test ADAM under an "enterprise pilot" program for 220 licenses.

98.     Around that time, an OpenPeak presentation made similar representations regarding how Hilton Hotels had signed on for 50,000 licenses.  This was misleading because, in reality, Hilton refused to sign *any* contract with OpenPeak, and simply agreed to test 100 licenses of ADAM for a period of four months.

### ii.  The Officer Defendants Issued Projections without Reasonable Basis

99.     In connection with their fundraising efforts, the Officer Defendants prepared and circulated financial projections.  Those projections, however, were based on unsupportable assumptions and were not realistic.  OpenPeak's projections were initially prepared by its CFO Lou Salamone ("Salamone").  During early to mid-2013, however, Defendant Barclay took over the preparation of the projections because Defendants Gittleman and Barclay wanted to create projections that were more aggressive than those prepared by Salamone.  Thereafter, Barclay prepared the projections, and along with Gittleman, presented the projections to investors.  Salamone ultimately resigned from OpenPeak in July 2013 because Barclay took over making the forecasts and presentations to investors.

100.    Defendants Gittleman and Barclay knew that the projections were based on unrealistic assumptions.  OpenPeak's Vice President of Finance, Steven Richards ("Richards"),

testified under oath that OpenPeak's projections were misrepresented and unattainable. Richards recalled that he was responsible for creating the projections by entering the numbers reported to him into a spreadsheet. Richards testified that he "never believed that [OpenPeak] would hit their forecast numbers" and that he raised concerns on many occasions about the likelihood that OpenPeak would not meet its forecast, but his concerns were generally ignored. Others, including former CFO Salamone, similarly expressed their disbelief to the Company's officers. Richards testified that Salamone had expressed to both Barclay and Gittleman that he was skeptical that OpenPeak's forecasts were attainable.

101.    Richards testified that he was told "[w]ell, we have to get to it [meaning the forecasted numbers]. *We want to have investors come in at this valuation, so we need to have this much sales to justify the valuation*." Richards testified that he "was concerned that *David Barclay was basically doing whatever he needed to do to make sure he was getting investor money*." Realizing the projections were totally unrealistic, Richards testified that he would try not to forward them to investors, and tried not to present anything directly to them.

102.    In fact, in an April 10, 2014 email exchange between Richards and Defendant Barclay, Richards questioned the Company's ability to meet its forecasts. Barclay wrote that it would "be great to get in front of [the] board and show how we beat our numbers!!!" Richards, one minute later, replied "?  We didn't even come close to beating our Board forecast.  We projected almost 100k licenses, including 50k+ from BB and even some licenses from DT."

103.    Examples of the Officer Defendants' misrepresentations regarding projections are set forth below:

(a)    In a June 18, 2013 email from Defendant Gittleman to an investor, Gittleman stated, in pertinent part, "that the potential [sale] volume with Blackberry is in the 10Ms of devices

in just the next few years." Gittleman lacked a reasonable basis to make this projection and Blackberry never activated a fraction of the tens of millions of licenses forecasted.

(b)    On July 24, 2013, investors were forwarded the Company's latest financial projections. According to the document, OpenPeak projected total revenues of $626,000 for the third quarter of 2013, $14 million for the fourth quarter of 2013, $27.6 million for the first quarter of 2014, $40.8 million for the second quarter of 2014, $45.8 million for the third quarter of 2014 and $53.7 million for the fourth quarter of 2014.

(c)    On or about January 22, 2014, Defendant Barclay emailed Hercules representatives and attached a January 2014 Executive Overview which made statements about OpenPeak's software, business opportunities, and revenues. The overview forecasted, for 2014, total revenue of $72,928,000, gross profit of $64,916,000, EBITDA of $35,295,000, and millions of license sales. In reality, OpenPeak's revenues from 2012-2016 *combined* did not even come close to $72.9 million, and OpenPeak did not come close to millions of license activations.

(d)    Hercules met with OpenPeak on or about February 11, 2014. Defendants Gittleman and Barclay represented to Hercules that OpenPeak would have 864,000 Toggle license sales to AT&T in 2014 alone, equating to $43 million in revenue for 2014. In actuality, total sales for 2014 were $16.5 million, less than half of the $43 million projected for AT&T alone.

(e)    OpenPeak also provided Hercules with projections for the fourth quarter of 2014. The projections forecasted revenues of $9,019,278, $9,707,403, and $13,753,978, during the months of October, November and December 2014, respectively. The actual revenues were markedly different, consisting of $1,364,999, $695,641 and $124,197 during the months of October, November and December 2014, respectively. The chart below highlights the stark difference between projected revenues and actual revenues during the fourth quarter of 2014:

| Revenues | October | November | December |
|---|---|---|---|
| Projected | $9,019,278 | $9,707,403 | $13,753,978 |
| Actual | $1,364,999 | $695,641 | $124,197 |
| Overstatement | 661% | 1,395% | 11,074% |

104.    On December 18, 2014, Defendant Hill emailed OpenPeak's Bryan Gillis regarding the Company's inability to forecast active users.  Hill wrote, "I hate to start the morning bitching but this sucks.  [T]he sales teams ability to forecast active users sucks.  [D]o you really believe we are going to get to 1000 total users by EOY.  I am going to start firing sales reps if they can't get their shit together and forecast worth a damn.  [O]ur credibility is near zero at this point."

105.    On January 20, 2015, Defendant Barclay emailed an investor and provided OpenPeak's "preliminary draft 2015 forecast."  According to the forecast, OpenPeak projected total revenues of $6.6 million in the first quarter of 2015, $13.2 million in the second quarter of 2015, $19.1 million in the third quarter of 2015, and $25.2 million in the fourth quarter of 2015.  In reality, OpenPeak barely cleared $10 million in revenue during all of 2015.

106.    The Officer Defendants lacked a reasonable basis to make each of the projections set forth above because ADAM did not work as intended, customers were dissatisfied with ADAM and complained about the quality of the product, and there were extremely low activation numbers with no reason to expect any meaningful change.

### iii. The Officer Defendants Misrepresented the Value of OpenPeak's Intellectual Property

107.    The Officer Defendants misrepresented the nature and value of the Company's patents to stakeholders as well as potential suitors.  Defendant Gittleman claimed to stakeholders that the Company's intellectual property could be sold for $200-$300 million and was extremely marketable to companies such as BlackBerry, VMware and others.  A material factor inducing

investors to get involved with OpenPeak was the near guarantee by OpenPeak that its patent portfolio could be sold for $200 million or greater.

108.    OpenPeak's intellectual property, however, was worth merely a fraction of the value represented by Defendant Gittleman.  Indeed, Citrix Systems, Inc. ("Citrix") evaluated OpenPeak's intellectual property and determined that it was worth no more than a maximum of $2 million.  Citrix's valuation was in line with the amount OpenPeak ultimately sold the portfolio for.[7]

109.    In addition to overstating the value of OpenPeak's patents, Defendant Gittleman misrepresented that its patents were original.  In reality, much of OpenPeak's patents were part of the core technology of competing companies including BlackBerry, VMware, and others.

### iv.  The Officer Defendants Manipulated OpenPeak's Financial Results to Make the Company Appear More Attractive to Potential Acquirers

110.    The Officer Defendants manipulated OpenPeak's financial results to make the Company appear more attractive to investors and potential acquirers.

111.    Richards testified that OpenPeak's officers were "doctoring" the Company's historical financials.  According to Richards, "instead of putting what you would normally put as a monthly close[,] what the revenue should be based off of GAAP, they were putting what they wanted to for the last two months that I was there or three months that I was there."

112.    For example, as alleged below, the Officer Defendants manipulated OpenPeak's financial results during 2014 and 2015.  During 2014, OpenPeak recognized more than $15.7 million in revenue from June to October 2014.  A significant portion of those revenues were derived from an $8 million prepayment by AT&T for the transfer of 225,000 licenses from OpenPeak.  Thereafter, the Officer Defendants, with the approval of the Director Defendants, took a large portion of those

---

[7]      On April 19, 2017, the Bankruptcy Court ordered the sale of OpenPeak's intellectual property to the highest bidder, for $1,025,000.

revenues out of the June to October 2014 time period, restated those financial results, and reused those revenues in subsequent months to make the Company look more appealing to potential acquirers.

113.    Specifically, during October 2014, the Company restated its previously reported June 2014 financial results by reducing revenues by more than $1.9 million and then, on or about January 15, 2015, restated its financial results for the periods of July 2014 through October 2014 by collectively reducing revenues by nearly $8 million.  According to trial testimony from Gittleman, the Board approved the restatement and the shifting of revenue from 2014 to 2015 at a January 29, 2015 Board meeting.

114.    The Company's revenues for the periods of July 2014 through October 2014 as originally reported and as restated are set forth below:

| Revenues | June | July | August | September | October | Total |
|---|---|---|---|---|---|---|
| As Reported | $2,377,306 | $1,983,369 | $3,460,205 | $4,411,232 | $3,494,115 | $15,726,227 |
| As Restated | $431,619 | $207,360 | $1,504,796 | $2,280,299 | $1,364,999 | $5,789,073 |
| Difference | $1,945,687 | $1,776,009 | $1,955,409 | $2,130,933 | $2,129,116 | $9,937,154 |

115.    The Officer Defendants removed the $8 million in revenue from the AT&T agreement payment, as well as nearly $2 million of other revenue from prior months, so they could reuse those revenues in future months.  The Officer Defendants did not restate OpenPeak's financial results out of concern that they were not proper as initially recorded.  In fact, in connection with litigation between the Officer Defendants and Hercules, when asked whether the manner in which OpenPeak initially recognized the revenue was in accordance with GAAP, Kwon testified: "My understandings is that the recognition of the $8 million, when it was received, was in accordance with GAAP."  Barclay contended the revenue was properly booked as initially reported.

116.    The Officer Defendants, with the approval of the Director Defendants, improperly and deceptively reused the previously recorded revenue in order to make OpenPeak appear more

appealing to a potential investor or suitor.    Indeed, according to deposition testimony from

Defendant Barclay, the restatement, which shifted revenue from 2014 forward into 2015, was carried

out because it "would position OpenPeak more favorably to a potential future acquirer and/or

investor."    Barclay reiterated his understanding during trial testimony, citing to a January 23, 2015

email in which he recounted, "I did have a call with [Hercules] a few weeks ago (John and Mark

were on it) on January 6th when I discussed with them that it might be in all of our best interests to

defer the $8M of the revenue we received from AT&T last year and instead recognize it in 2015 so

that *it would help show growth going into this year*."    Later during the trial, he confirmed that a

restatement would be "in all of our best interests because our goal was to position the company for

sale" and that "to defer [the] revenue would smooth a large spike in revenue showing [a] stream of

income every month."

117.    Defendant Kwon also testified at trial that the restatement occurred "to make the

financials more even, and frankly, more attractive to a particular buyer."

118.    The Durkin Group, which was hired to conduct a field audit of OpenPeak following

the restatement, confirmed Barclay and Kwon's understanding in its report – that OpenPeak restated

its financial results in order to present a more level stream of revenue to make OpenPeak more

desirable to potential acquirers.    The below chart reflects OpenPeak's revenue as reported during

2015, which included the recycled revenue from 2014:

| Quarter | Revenue |
|---|---|
| First Quarter 2015 | $41,194 |
| Second Quarter 2015 | $7,890,685 |
| Third Quarter 2015 | $1,017,534 |
| Fourth Quarter 2015 | $3,398,538 |

119.    Armed with the recycled revenue from 2014, the Officer Defendants raised more than

$26 million from investors during 2015.    The chart below lists OpenPeak's reported revenue and

amount raised from investors during each quarter of 2015:

| Quarter | Revenue | Amount Raised |
|---------|---------|---------------|
| First Quarter 2015 | $41,194 | $10,900,000 |
| Second Quarter 2015 | $7,890,685 | $7,295,000 |
| Third Quarter 2015 | $1,017,534 | $6,392,864 |
| Fourth Quarter 2015 | $3,398,538 | $1,690,000 |

120.    Unbeknownst to stakeholders and potential investors, on or about January 23, 2015,

after Hercules learned about the restatement of OpenPeak's financials, Hercules communicated its

desire to pull out its investment.

121.    Richards also indicated during testimony that he recalled a time when OpenPeak

improperly recorded service revenue.  Based on communications he had with Toggle's product

teams, Richards knew how far along the product was relative to milestones that needed to be met in

order to recognize revenue.  Richards testified that he spoke to Defendant Barclay on or about April

4, 2014 about the fact that there were no documents to support Barclay's claim that OpenPeak had

completed the requisite service milestones to warrant the recognition of revenue.  Richards testified

that Barclay never provided him with the proof Richards deemed necessary for the recognition of the

revenue, but the revenue was still recorded.

### v.    The Officer Defendants Misrepresented Facts Concerning the Ability for OpenPeak to be Sold

122.    The Officer Defendants repeatedly misrepresented to stakeholders that OpenPeak

could be sold for hundreds of millions of dollars.  In reality, the Company was not worth anything

close to what was represented.

123.    For example, on April 4, 2013, investors received an email from a stakeholder who

spoke with Defendant Gittleman which stated, "Dan [Gittleman] believes [a sale] will be in the

$200-250M range."  On May 18, 2015, investors received an email from a stakeholder which

informed them that Gittleman said: "We are still on track for an August sale of the Company. . . .  It

would be an understatement to say there is significant interest in the Company."  During the same

time period, Gittleman told investors that VMware had expressed an interest in buying the Company, and if that failed, he could sell the Company to Blackberry, for example, "in a day" for over $100 million.

124.    During 2015, Defendant J.T. Hill brought in a firm named Evercore Partners to facilitate a sale of the Company.[8]  One former investor participated in a three-way call with Gittleman and a representative of Evercore in the summer of 2015 during which Gittleman and the Evercore representative falsely represented that OpenPeak had a firm offer from VMware for $180 million.

125.    Despite these representations, however, Defendants were never able to consummate a deal.  The Officer Defendants lacked a reasonable basis to make such optimistic statements regarding their ability to sell OpenPeak at the amounts specified.

**G. Potential Deals for the Sale of OpenPeak Fell Through Because of the Officer Defendants' Lack of Credibility During Negotiations**

126.    Beginning in 2012, OpenPeak was approached by companies that had an interest in acquiring the Company or its assets.

127.    Any meaningful discussions with a potential acquirer followed a similar pattern. Those companies were initially interested in OpenPeak based on Defendant Gittleman's misleading statements about the Company, its business, its software, and the value of its intellectual property. Gittleman and the Company's officers misrepresented or hid facts about OpenPeak and its products to potential acquirers giving them the false initial impression that OpenPeak was much more

---

[8]    One former investor learned after OpenPeak's bankruptcy that Evercore eventually fired OpenPeak when Evercore realized they would be unable to effectuate a sale of OpenPeak.  The Officer Defendants failed to disclose this information as they were raising money from investors during 2015.

valuable than it really was.  Those entities would then express an interest in OpenPeak and perform due diligence.

128.     Once those companies performed due diligence, however, they learned the truth and were no longer interested – regardless of the cost – because the Officer Defendants had lost all credibility.  During due diligence, those entities discovered that OpenPeak's intellectual property was not valuable, OpenPeak's software had problems, and OpenPeak had very few active users.

129.     The Officer Defendants breached their fiduciary duties by engaging in deceitful conduct with potential suitors.  As a result of the wrongful conduct engaged in by the Officer Defendants, OpenPeak was unable to be sold.  Below are two examples:

### i.  Citrix Systems, Inc.

130.     The Officer Defendants presented a misleading picture of OpenPeak in order to entice Citrix to negotiate a deal to acquire the Company.  As discussed below, the deal fell apart after Citrix learned about the deception by the Officer Defendants.

131.     During 2012, Citrix evaluated OpenPeak as a potential acquisition candidate.  At the first meeting between the two companies, attended by Defendants Sculley and Gittleman, Gittleman provided Citrix with information related to OpenPeak's financial results, the number of software licenses sold through AT&T, and the core features of OpenPeak's mobile platform, including those claimed to be "game changing" and unique to OpenPeak.  Thereafter, Sculley emailed the CEO of Citrix, Mark Templeton, to vouch for Gittleman, calling him a "visionary."

132.     Citrix was interested in exploring opportunities based on Defendant Gittleman's representations.  One of the key drivers for Citrix's interest was the purported ramping up of revenue from the sale of licenses through AT&T.

133.     On May 6, 2012, Citrix sent OpenPeak a non-binding letter of intent, which included a purchase price in an amount not to exceed $500 million.

134.    By July 2012, Citrix was in the midst of conducting due diligence, but needed additional time to review "ADAM's business, including the AT&T Toggle account." A former employee recalled that during due diligence, in an attempt to impress Citrix representatives when they visited OpenPeak's offices, the Officer Defendants hired between 30-40 actors to pretend they were employees to make it appear that the Company was busier and more impressive than it actually was. According to the former employee, Defendant Gittleman joked about the hiring of the actors and recounted that he did a similar thing at a previous company named StorageApps.

135.    As part of the due diligence, Citrix scheduled a meeting with AT&T to discuss its level of interest and plans for the OpenPeak software that AT&T branded as Toggle. Just prior to the scheduled site visit at AT&T, a member of the Citrix team was inadvertently copied on an email from AT&T to OpenPeak. That email contained the actual number of licenses sold by AT&T, the number of licenses activated, and the revenue generated by OpenPeak to date. The numbers for each category were substantially lower than what OpenPeak had reported to Citrix. Moreover, according to a former employee, the Officer Defendants took the best-case-scenarios projected by AT&T and presented them to Citrix as though they were the conservative, floor projections.

136.    In addition to overstating OpenPeak's financial performance and projections, the Officer Defendants also overstated the value of OpenPeak's intellectual property. They represented that OpenPeak's intellectual property was valued between $200-$300 million. When Citrix performed due diligence it determined that the intellectual property portfolio was valued at no more than $2 million and likely less.

137.    The Officer Defendants also misrepresented the functionality of OpenPeak's products. Citrix found that ADAM was not mature in its development, was not scalable (meaning it could not grow to accommodate the number of users envisioned), would require at least nine months

of remediation to get it working properly, and that it suffered from deep "go-to-market" flaws (meaning the ability to bring the product to the market for sale).

138.    Finally, unbeknownst to stakeholders, in breach of his duty of loyalty, Defendant Gittleman was negotiating a $50 million payment in Citrix stock for himself and other Company employees if certain conditions were met.

139.    When Citrix learned that the Officer Defendants had misrepresented facts about OpenPeak, they lost credibility and Citrix eventually walked away from the deal.  Defendant Gittleman hid from stakeholders the true reasons why the Citrix deal fell apart and instead told them that the Citrix offer was too low and that OpenPeak was holding out for a better price.

### ii. Synchronoss Technologies, Inc.

140.    During 2014, the potential acquisition of OpenPeak by a company named Synchronoss Technologies, Inc. ("Synchronoss") followed a pattern very similar to that of the potential Citrix deal.  As with the Citrix deal, Synchronoss was initially interested in OpenPeak based on misrepresentations by the Officer Defendants about OpenPeak's financial performance and prospects.  Furthermore, as with the Citrix deal, the Officer Defendants' lack of credibility was a primary reason the deal did not go through.

141.    In or about October 2014, the Company received a preliminary written indication of interest for an acquisition of OpenPeak by Synchronoss for $300 million, consisting of 60% cash and 40% stock.  Once Synchronoss performed due diligence and learned the details about how OpenPeak would only be able to recognize revenues from AT&T once 225,000 licenses were activated, its interest in OpenPeak subsided.

142.    On November 11, 2014, during Synchronoss' due diligence for the deal, Defendant Barclay sent an email to Defendants Gittleman and Hill stating, "[Synchronoss is] worried about our 225k license 'hole[.]'  They realize that before we get 225k active licenses, revenue will be zero."

Thus, Synchronoss became aware that OpenPeak would not make any money from sales to AT&T until AT&T activated all 225,000 licenses it prepaid for under Amendment No. 6 to the Master Resale Agreement.

143.    Moreover, Defendant Gittleman reported during a November 18, 2014 Merger & Acquisition Committee Meeting that it was the large backlog of over 800,000 licenses already provided by AT&T to end-users, which would not generate revenue until they were activated, that sparked Synchronoss' desire to better understand the process and timeline for these activations and how OpenPeak would be paid.

144.    On December 29, 2014, Defendant Gittleman confirmed to the Board that activity relating to the proposed acquisition by Synchronoss had terminated.   According to internal communications sent by Synchronoss' Chairman and CEO to his own deal team, he "could not get past the lack of visibility in the business" and the ***Officers' lack of*** "***credibility . . . communicated during the process***."   Gittleman, however, falsely told investors that negotiations ended due to a drop in the price of Synchronoss' stock, which made a deal from Synchronoss' perspective undesirable.

## H.  Defendant Gittleman, with the Approval of the Board, Strong-Armed Investors into Providing Additional Funding

145.    By the beginning of 2013, it was clear to OpenPeak's officers and Directors that due to OpenPeak's extremely high burn rate and the lack of meaningful revenue, the Company needed to continually raise money to sustain operations.

146.    Notwithstanding the fact that the Company had $80 million in debt with the inability to pay it off, Defendant Gittleman, with the approval of the Board, sought to raise additional capital from existing investors through a bridge round of funding.

147.    In order to pressure investors to provide capital, the bridge round was structured so that new investments diluted existing stakeholders.  Defendant Gittleman even prepared documents for investors showing them how much they would be diluted by if they did not invest additional funds.

148.    This strong-armed strategy was discussed at a January 27, 2013 Board meeting, during which Defendant Gittleman indicated that this was an effective way to get people to invest and that he would be interested in using this technique in the future.

## I.    The Board Breached Its Fiduciary Duties

149.    Directors of a corporation are required to oversee the management of the company and protect the interests of the company and its stakeholders.

150.    Here, the Board failed to protect the interests of the Company's stakeholders.  The Board also failed to properly oversee the management of the Company, served as a rubberstamp for the Officer Defendants and kept their heads in the sand as the Officer Defendants ran the Company in a reckless, wasteful, and self-serving manner, in violation of their fiduciary duties and the Company's Code of Business Ethics.

151.    After OpenPeak became insolvent, OpenPeak's stakeholders were its creditors.  The members of the Board breached their fiduciary duties by permitting Defendant Gittleman to continue raising millions of dollars in debt after the Company became insolvent, did not have a functional software product, and had intellectual property valued at no more than a few million dollars.

152.    Indeed, even though the Company had completely written down the value of its software by the end of 2013, and never had a fully operational product after that, the Board enabled the Officer Defendants to raise millions of dollars through debt during 2014 and then increase the Company's outstanding debt by more than $76 million – representing a 400% increase in outstanding debt – during 2015 alone.

153.     Once OpenPeak was insolvent, the Board should have sought to protect the interests

of the creditors, sought to prevent Defendant Gittleman from raising additional funds through debt

offerings, and caused the Company to file for bankruptcy protection or restructure its debt.  The

creditors would have benefited from a bankruptcy filing if it had been done at the appropriate time.

154.     Furthermore, by failing to protect the interests of the stakeholders, members of the

Board breached their fiduciary duty of loyalty by acting in their own financial interests to the

detriment of the Company's stakeholders.

155.     OpenPeak's Board was comprised of eight members.  All Directors held financial

interests in OpenPeak equity or convertible debt.  Based on filed claims in the OpenPeak bankruptcy,

all Directors had financial interests aligned with holders of OpenPeak equity.  As such, it served the

financial interests of those Directors to avoid bankruptcy regardless of the deepening insolvency of

the Company.

156.     Similarly, it served the Defendants' financial interests for OpenPeak to borrow as

much money as possible in the hope that, no matter how far-fetched, the Company would be sold.

Only a sale of the Company would have enabled the Officer Defendants and nearly every member of

the Board to maximize the value of their OpenPeak holdings.

## DAMAGES

157.     As a result of the Defendants' wrongful conduct, including the deceptive manner in

which the Officer Defendants operated the Company, dealt with customers and potential acquirers,

and solicited investments, OpenPeak and its stakeholders were damaged.

158.     Defendants' breaches of fiduciary duty damaged OpenPeak.  First, OpenPeak was

damaged as a result of the deepening insolvency of the Company by $22.5 million during 2014 and

$76 million during 2015.  Second, in 2014, despite being insolvent, the Officer Defendants

misrepresented material facts to investors and stakeholders, causing them to invest $22.5 million.  In

2015, while the Company was insolvent, the Officer Defendants misrepresented material facts to investors and stakeholders, causing them to invest an additional $26.2 million in the Company. Plaintiff seeks to recover the full $48.7 million from those investments.

159.    Third, OpenPeak was damaged as a result of Defendants' breaches of fiduciary duty in connection with the lost opportunities for the sale of OpenPeak.  The Defendants' deceitful conduct caused two suitors to walk away from potential deals with OpenPeak.  In 2012, OpenPeak lost out on the potential $500 million Citrix deal after Citrix learned that the Officer Defendants had misrepresented financial projections.  And in 2014, OpenPeak lost out on the potential $300 million Synchronoss deal due to the lack of the Officer Defendants' credibility in presenting information to Synchronoss.  Even though the true value of OpenPeak may have been less than the proposed amounts for the transactions, had the Officer Defendants not breached their fiduciary duties OpenPeak could have been sold for at least $30 million and was damaged thereby.

160.    Fourth, the breaches of fiduciary duty by the Officer Defendants also caused the failure of ADAM.  Instead of operating the Company and dealing with customers in an appropriate manner, Defendant Gittleman and other Company officers repeatedly deceived customers about the functionality of ADAM, failed to properly address issues with the software, and created an environment in which the Company could not succeed.  Defendants are liable for damages arising from the failure of OpenPeak as an ongoing entity in an amount to be determined at trial by experts.

161.    Fifth, Defendants are liable for the damages arising from the Officer Defendants wasting corporate assets, treating the Company as their personal piggy bank, and taking money out of the Company that was never repaid.  With respect to the waste of corporate assets, the below represents the damages sought by the Plaintiff:

(a)     hotel stays at CES in excess of $200,000;

(b)      hundreds of thousands of dollars in private jet travel;

(c)      over $400,000 in personal loans made to Defendants Gittleman and Kwon;

(d)      tens of thousands of dollars in rental fees paid to Defendant Gittleman for the use of his residence for OpenPeak meetings;

(e)      over $10,000 in Apple watches, and other gadgets, bought for Defendant Gittleman and his inner circle; and

(f)      tens of thousands of dollars in salaries and related expenses for the continued development of the ADAM program in the programing language Java, despite replacing it with a PHP version.

162.    Sixth, Defendants are liable for damages arising from the Officer Defendants unjustly enriching themselves through their deceitful conduct.  With respect to the unjust enrichment claim, the below represents the damages sought by the Plaintiff:

(a)      over $5 million in salaries for Defendants Gittleman, Hill, Barclay and Kwon;

(b)      hundreds of thousands of dollars in private jet travel;

(c)      over $400,000 in personal loans made to Defendants Gittleman and Kwon;

(d)      tens of thousands of dollars in personal debits from OpenPeak to pay for personal, non-business related expenses charged on the Company's officers' American Express cards;

(e)      tens of thousands of dollars in rental fees paid to Defendant Gittleman for the use of his residence for OpenPeak meetings; and

(f)      over $25,000 in stolen computer servers.

163.    Seventh, Defendants are liable for the damages arising from the Officer Defendants' fraudulent transfers, for *inter alia*, the following:

(a)     the salaries for Defendants Gittleman, Hill, Barclay and Kwon between September 2014 and September 2016, estimated at over $2 million;

(b)     at least tens of thousands of dollars OpenPeak paid for personal, non-business related expenses charged on the Company's officers' American Express cards, between September 2014 and September 2016;

(c)     over $400,000 in personal loans made to Defendants Gittleman and Kwon;

(d)     hundreds of thousands of dollars in salaries and related expenses for the continued development of the ADAM program in the programing language Java, between September 2014 and September 2016, despite replacing it with a PHP version; and

(e)     the value of computer servers and other property that were missing from the Company upon inspection by the Trustee or his representatives.

## COUNT I

**Breach of Fiduciary Duty**
**Against the Officer and Director Defendants**

164.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

165.    The Defendants violated their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, disclosure, candor, management, oversight and supervision.  As described in detail herein, each of the Defendants, as an officer and/or Director, was a fiduciary of the Company and had a fiduciary duty to ensure that OpenPeak disseminated accurate, truthful and complete information to its creditors.  Defendants knowingly caused the Company to disseminate to its creditors, materially misleading and inaccurate information.  The Officer Defendants also caused or allowed OpenPeak documents and property to be deleted or destroyed.  These actions could not

have been a good faith exercise of prudent business judgment as they were in violation of applicable law.

166.    The Defendants also breached their duties by failing to prudently supervise, manage and control the operations of OpenPeak.  The Defendants, by their actions, including the wrongdoing described herein, abandoned and abdicated their fiduciary responsibilities and duties with regard to prudently managing OpenPeak in a manner consistent with the duties imposed upon them by law. The Defendants either violated the Company's Code of Business Ethics or were complicit in the violations by the other Defendants.  By committing the misconduct described herein, the Defendants breached their fiduciary duties to monitor, manage, and oversee the management and administration of OpenPeak's affairs and in the use and preservation of OpenPeak's assets.

167.    The Defendants further breached their duty by failing to seek bankruptcy protection sooner, in light of the facts and circumstances known to them during the time period discussed herein.  Defendants, by their inaction, have caused substantial harm to OpenPeak.  The Defendants also breached their duty of loyalty, by seeking to recover money or their own investments, while ignoring what was in the best interest of OpenPeak's stakeholders, causing harm to both OpenPeak and its stakeholders.

168.    During the course of the discharge of their duties, the Defendants knew, or wrongfully disregarded, the unreasonable risks and losses associated with their misconduct, yet the Defendants caused or permitted OpenPeak to engage in the wrongdoing complained of herein, which they knew had an unreasonable risk of material damage to OpenPeak, thus breaching their duties to the Company.

169.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary obligations, the Company had suffered substantial damages, not only monetary, but also to its corporate image and goodwill, which ultimately led to the Company filing for bankruptcy.

170.    Plaintiff has no adequate remedy at law.

## COUNT II

### Waste of Corporate Assets
### Against the Officer Defendants

171.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

172.    The Officer Defendants owed OpenPeak the obligation to avoid wasting OpenPeak's assets.

173.    The Officer Defendants allowed for lavish and wasteful spending, for their own benefit or for the benefit of other employees, including, without limitation, personal loans, personal air travel, over the top hotel accommodations, high-tech gadgets, and unnecessary salaries – all while the Company was in a dire financial condition.

174.    The Officer Defendants breached their obligations to OpenPeak by spending, or allowing spending, on unnecessary, non-business related items, resulting in a needless and wasteful use of corporate assets.  As a direct and proximate result of the waste of corporate assets by the Officer Defendants, OpenPeak has been damaged.  Further, as a result of their waste of corporate assets, the Officer Defendants are liable to the Company.

175.    Plaintiff has no adequate remedy at law.

## COUNT III

### Unjust Enrichment
### Against the Officer Defendants

176.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

177.    By their wrongful acts and omissions, the Officer Defendants were unjustly enriched at the expense of, and to the detriment of, OpenPeak as a result of the compensation and other benefits they received while simultaneously breaching their fiduciary duties owed to the Company.

178.    The Officer Defendants, as detailed herein, were unjustly enriched when they received over $5 million in salaries, spent hundreds of thousands of dollars in private jet travel, received over $400,000 in personal loans that went unpaid, spent tens of thousands of dollars of Company money to pay for personal, non-business related expenses, received tens of thousands of dollars in rental fees for the use of their residences for OpenPeak meetings, and received over $25,000 in stolen computer servers.

179.    The Officer Defendants should be required to disgorge the improper benefits which they unjustly obtained at the expense of OpenPeak and its stakeholders.

## COUNT IV

### Fraudulent Transfer – 11 U.S.C. §§ 548(a)(1), 544(b), 550(a), N.J. Stat. § 25:2-20 *et seq.*
### Against the Officer Defendants

180.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

181.    Any payments made to the Officer Defendants under an employment agreement or otherwise made to them, or on their behalf, constitute a transfer of interest of OpenPeak property.

182.    The Officer Defendants, as detailed herein, engaged in a course of conduct by which they drew excessive salaries and used OpenPeak funds to pay for their personal expenses

accumulated on their American Express credit cards.  In 2015 alone, the Officer Defendants drew salaries of $1.6 million.  They were projected to do the same in 2016.  During the same period, they incurred tens of thousands of dollars of personal credit card charges that were paid by the Company. Defendant Gittleman also caused the Company to pay salaries to his friends despite there being no legitimate business purpose for their work, including those who continued developing the Java version of ADAM.  Defendants Gittleman and Kwon also received $400,000 in personal that went unpaid.

183.    OpenPeak did not receive reasonably equivalent value or fair consideration in exchange for such transfers.

184.    The Officer Defendants intended to hinder, delay or defraud OpenPeak's creditors by making such transfers, to the Officer Defendants' benefit, without consideration to OpenPeak.

185.    At the time of such transfers, (i) OpenPeak was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with OpenPeak was an unreasonably small capital, and/or (ii) OpenPeak intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

186.    At the time of such transfers, dating back two years before the bankruptcy petition, OpenPeak was insolvent, or became insolvent as a result of the obligations incurred or the payments made.

187.    At the time of such transfers, the Officer Defendants had reasonable cause to believe that OpenPeak was insolvent.

188.    Consequently, such transfers were fraudulent as to then present and future creditors.

189.    The Officer Defendants should be required to return the value they received pursuant to such fraudulent transfers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by OpenPeak as a result of the Defendants' wrongful conduct;

B.    Awarding to OpenPeak restitution from the Officer Defendants, and ordering disgorgement of all profits, benefits and other compensation obtained by Officer Defendants;

C.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.    Granting such other and further relief as the Court deems just and proper.

DATED:  March 6, 2018                    FORMAN HOLT
                                         MICHAEL E. HOLT


                                         */s/ Michael E. Holt*
                                         MICHAEL E. HOLT

                                         66 Route 17 North, First Floor
                                         Paramus, NJ  07652
                                         Telephone:  201/845-1000
                                         Facsimile:  201/655-6650

                                         *Attorney for Charles M. Forman Chapter 7*
                                         *Trustee*

F0016820 - 1                                                              - 54 -

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN*
WILLIAM J. GEDDISH*
CHRISTOPHER T. GILROY*
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
Facsimile:  631/367-1173
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
wgeddish@rgrdlaw.com
cgilroy@rgrdlaw.com

* admitted *pro hac vice*

*Special Litigation Counsel for Trustee*