FORMAN HOLT
MICHAEL E. HOLT
365 West Passaic Street, Suite 400
Rochelle Park, New Jersey 07662
Telephone:  201/845-1000
Facsimile:  201/655-6650

*Attorneys for Charles M. Forman, Trustee*

[Additional counsel appear on signature page.]


UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: OPENPEAK, INC. | ) Case No. 16-28464-SLM |
| | ) |
| Debtor. | ) Chapter 7 |
| | ) |
| CHARLES M. FORMAN, TRUSTEE, | ) Adv. Pro. No. 17-01755-SLM |
| | ) |
| Plaintiff, | ) SECOND AMENDED COMPLAINT |
| vs. | ) |
| | ) |
| DANIEL GITTLEMAN, DAVID BARCLAY, | ) |
| CHRISTOPHER HILL, HOWARD KWON, | ) |
| JOHN SCULLEY, ALEX KOMOROSKE, | ) |
| JOACHIM GFOELLER, JR., J. TOMILSON | ) |
| HILL, III, JAMES ROBINSON, IV, and | ) |
| MORTON TOPFER, | ) |
| | ) |
| Defendants. | ) |
| | ) |

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION ................................................................ 1

JURISDICTION AND VENUE .......................................................... 3

PROCEDURAL BACKGROUND........................................................ 3

BASIS OF ALLEGATIONS ............................................................... 5

THE PARTIES.................................................................................... 5

DEFENDANTS' DUTIES................................................................... 6

BACKGROUND ALLEGATIONS...................................................... 7

    A.    The Company .......................................................................... 7

    B.    OpenPeak Depended upon Other People's Money.................... 8

    C.    OpenPeak and Its ADAM Product Experienced Severe Problems...... 11

        i.    AT&T Was Dissatisfied with ADAM ...................... 13

        ii.    Blackberry Was Dissatisfied with ADAM ............... 16

        iii.    Former OpenPeak Employees Revealed Problems with OpenPeak and ADAM....... 17

    D.    OpenPeak Determines the ADAM Java Software Is Worthless in 2013.............. 19

    E.    Potential Deals for the Sale of OpenPeak Fell Through Because of the Defendants' Lack of Credibility During Negotiations......................... 22

        i.    Citrix Systems, Inc................................................. 22

        ii.    Synchronoss Technologies, Inc. .............................. 24

    F.    The Defendants' History of Wasteful Spending .................... 26

SUBSTANTIVE ALLEGATIONS ...................................................... 27

    A.    The Defendants Treated OpenPeak as Their Personal Piggy Bank ...... 27

        i.    Improper Salaries ................................................... 28

        ii.    Unpaid Loans ......................................................... 28

        iii.    Improper Spending.................................................. 29

**Page**

B.    The Defendants Misrepresented Facts to Stakeholders and
Investors and Breached Their Duty of Candor ...................................................... 30

    i.    Misrepresentations Regarding the Adoption of ADAM and Related
Potential Revenue ...................................................................................... 31

    ii.    The Defendants Issued Projections Without Reasonable Basis ................ 33

    iii.    The Defendants Misrepresented the Value of OpenPeak's
Intellectual Property .................................................................................. 36

    iv.    The Defendants Manipulated OpenPeak's Financial Results to
Make the Company Appear More Attractive to Potential Acquirers ........ 37

    v.    The Defendants Misrepresented Facts Concerning the Ability for
OpenPeak to be Sold ................................................................................. 40

DAMAGES ........................................................................................................................ 40

COUNT I

    Breach of Fiduciary Duty of Disclosure and Candor
(Against Defendant Gittleman) ............................................................................... 42

COUNT II

    Breach of Fiduciary Duty of Disclosure and Candor
(Against Defendant Barclay) ................................................................................... 44

COUNT III

    Breach of Fiduciary Duty of Disclosure and Candor
(Against Defendant Kwon) ...................................................................................... 48

COUNT IV

    Waste of Corporate Assets
(Against Defendant Gittleman) ............................................................................... 49

COUNT V

    Waste of Corporate Assets
(Against Defendant Barclay) ................................................................................... 50

**Page**

COUNT VI

      Waste of Corporate Assets
      (Against Defendant Kwon) ................................................................. 52

COUNT VII

      Waste of Corporate Assets
      (Against Defendant Hill) ................................................................. 53

COUNT VIII

      Fraudulent Transfer Under 11 U.S.C. §§548(a)(1), 544(b), 550(a)
      (Against Defendant Gittleman) ........................................................... 54

COUNT IX

      Fraudulent Transfer Under N.J. Stat. §25:2-20 *et seq.*
      (Against Defendant Gittleman) ........................................................... 56

COUNT X

      Fraudulent Transfer Under 11 U.S.C. §§548(a)(1), 544(b), 550(a)
      (Against Defendant Barclay) ............................................................. 57

COUNT XI

      Fraudulent Transfer Under N.J. Stat. §25:2-20 *et seq.*
      (Against Defendant Barclay) ............................................................. 59

COUNT XII

      Fraudulent Transfer Under 11 U.S.C. §§548(a)(1), 544(b), 550(a)
      (Against Defendant Kwon) ............................................................... 60

COUNT XIII

      Fraudulent Transfer Under N.J. Stat. §25:2-20 *et seq.*
      (Against Defendant Kwon) ............................................................... 62

COUNT XIV

      Fraudulent Transfer Under 11 U.S.C. §§548(a)(1), 544(b), 550(a)
      (Against Defendant Hill) ................................................................. 64

**Page**

COUNT XV

    Fraudulent Transfer Under N.J. Stat. §25:2-20 *et seq.*
    (Against Defendant Hill)........................................................................ 65

PRAYER FOR RELIEF ............................................................................ 66

Plaintiff, Charles M. Forman (the "Trustee" or "Plaintiff"), trustee for the chapter 7 estate of OpenPeak, Inc. ("OpenPeak" or the "Company"), by and through his undersigned attorneys, makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon investigation of counsel:

## NATURE OF THE ACTION

1.      Plaintiff brings this action against certain former officers of OpenPeak for breach of fiduciary duty, waste of corporate assets, and fraudulent transfer.  Plaintiff, through his counsel, has conducted an investigation and based on this investigation now seeks redress on behalf of OpenPeak for the Defendants' (defined below) improper actions.

2.      Prior to its bankruptcy filing in September 2016, OpenPeak was a private company that developed software.  Its primary software product, ADAM, was developed to allow employees to securely access their company workspaces on personal mobile devices.

3.      OpenPeak's failure was a direct result of wrongful conduct engaged in by its senior officers, including defendants Daniel Gittleman ("Gittleman"), David Barclay ("Barclay"), Christopher Hill ("Hill") and Howard Kwon ("Kwon," together with Gittleman, Barclay and Hill, the "Defendants").   As alleged below, the Defendants ran OpenPeak in an unethical and unscrupulous manner that permeated the Company's dealings with investors, customers, and potential acquirers.  Gittleman and the other Defendants built and ran a company based on lies and falsehoods that ultimately became a house of cards waiting to collapse.  The Defendants' wrongful actions and misrepresentations negatively impacted OpenPeak's reputation and relationship with customers, hampered the ability of the Company and its assets to be sold, weakened the financial condition of the Company, and caused Company stakeholders to lose millions of dollars.

4.      The Company's customers were dissatisfied and frustrated with ADAM because Defendant Gittleman and other Company officers over-hyped the ADAM software, promoted

features that didn't exist, and hid fundamental flaws in the software.  Gittleman put on flashy

presentations to demonstrate ADAM's capabilities even though he knew it would not operate as

shown if it was implemented by the customer.  OpenPeak's inability to deliver products as falsely

promised caused customers to cancel contracts, and as a result, harmed the Company.

5.      Since the Company failed to generate meaningful revenues from its products,

OpenPeak needed to continually seek capital from investors, raising over $120 million between 2011

and 2016.  To encourage investments, the Defendants, in breach of their fiduciary duty of candor,

falsely represented to existing (and potential stakeholders) that the ADAM product was doing well

and was widely adopted by customers, misrepresented OpenPeak's financial results to make the

Company look more attractive, and issued financial forecasts reflecting exponential growth which

were not based on realistic assumptions.  Contrary to the Defendants' positive statements, the

ADAM product was plagued with structural and fundamental problems that were extremely difficult

to fix, the product was not scalable, its largest business development customers, AT&T and

Blackberry Corporation ("Blackberry"), were dissatisfied with the product, and even though

OpenPeak had provided hundreds of thousands of licenses to potential customers, only a minuscule

percentage of the licenses were ever activated by end-users.  The Defendants also represented that

the Company's intellectual property assets were worth hundreds of millions of dollars when in

actuality they were worth much less.

6.      At the same time OpenPeak struggled to generate meaningful revenues and to pay

basic corporate expenses, Gittleman and the other Defendants treated the Company as their personal

piggy bank and wasted corporate assets to benefit themselves to the detriment of the Company.

Gittleman and the other Defendants took money out of the Company that was never repaid, drew

excessive salaries, and caused OpenPeak to fund their luxurious lifestyles.  For example, Gittleman

abused his corporate credit card, stayed in hotel rooms costing $10,000 a night, caused the Company to issue loans that remain unpaid, and paid large salaries to his friends and incurred other unnecessary costs to develop a product that was abandoned by the Company.

7.     During 2014 and early 2015, when it was clear that ADAM was fundamentally flawed and OpenPeak was insolvent, the Company was unable to generate meaningful revenue to satisfy its debts.  These problems continued and worsened into 2016, as the Defendants were no longer able to raise money or sell the Company, and stakeholders began to realize the extent of their deceptions.  As investor Mike Perry wrote to Gittleman on February 16, 2017:

> I just [got] an email from Dr. Gorton.  ***Really, and if so what happened to the management of the company.***  What was the board of directors doing to oversee the company.  ***What happened to you Dan?  I am shocked about what you and David [Barclay], and Howie [Kwon], represented to Susan and me at Newport Beach***.  I expect a call.  Every time I ask you to call you never do***.  I invested $4.5 with you. You OWE ME A CALL***!!!  I know that you won't call.  ***I am mad and sorry I listened and trusted you***.  I know you won't call.  I thought we were friends.  I guess not.  Thank you.[1]

8.     OpenPeak was forced to file for chapter 7 bankruptcy protection on September 27, 2016.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. This is a core proceeding under 28 U.S.C. §157.  Venue of this adversary proceeding in this district is proper under 28 U.S.C. §1409(a).

## PROCEDURAL BACKGROUND

10.     On September 27, 2016, OpenPeak filed a voluntary chapter 7 petition in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court").  *See In re: OpenPeak, Inc.*, No. 16-28464(SLM) (Bankr. D.N.J.).  The same day, Charles M. Forman was

---

[1]   Unless otherwise noted, emphasis is added throughout.

appointed as Trustee.  On October 20, 2016, the Bankruptcy Court appointed LeClairRyan, P.C. as the Trustee's general bankruptcy counsel.

11.     On March 20, 2017, Robbins Geller Rudman & Dowd LLP was appointed special litigation counsel to the Trustee to investigate and pursue, if appropriate, potential claims or causes of action against the former officers, directors, and employees of OpenPeak.

12.     On July 7, 2017, the Bankruptcy Court entered an order granting the substitution of counsel from LeClairRyan, P.C. to Forman Holt, since the attorney acting as general bankruptcy counsel to the Trustee changed firms.

13.     Plaintiff filed an initial complaint on December 4, 2017, which was amended on March 6, 2018 (the "Amended Complaint"), and named both the Defendants and the Outside Directors.[2]

14.     The parties, including both the Defendants and the Outside Directors, briefed Motions to Dismiss the Amended Complaint in the Summer of 2018, and attended an oral argument held on August 29, 2018.

15.     The Court issued an Opinion on the Motions to Dismiss on December 10, 2020, which dismissed all claims against the Outside Directors, and allowed Plaintiff to replead his breach of fiduciary duty, waste of corporate assets, and fraudulent transfer claims against the Defendants. Subsequent Orders related to the Opinion were issued on December 15, 2020 (granting the Outside Directors' Motion to Dismiss) and December 22, 2020 (granting in part, and denying in part, the Defendants' Motion to Dismiss).

---

[2]     The "Outside Directors" include: John Sculley, Alex Komoroske, Joachim Gfoeller, Jr., J. Tomilson Hill, III, James Robinson, IV, and Morton Topfer.

## BASIS OF ALLEGATIONS

16.     The allegations herein are based upon an investigation conducted by, and under the

supervision of, Plaintiff's counsel.  This investigation included examining and analyzing information

obtained from numerous public and proprietary sources – including, *inter alia*, court filings related

to the Company and Defendants, publicly available reports, press releases, published interviews,

news articles and other media reports (whether disseminated in print or by electronic media), and a

review and analysis of internal OpenPeak documents and communications[3] involving former

OpenPeak officers, directors, and employees.

17.     Additionally,    Plaintiff's    counsel    conducted    discovery    pursuant    to

Fed. R. Bankr. P. 2004 involving former employees, officers, directors, investors, customers, and

professional service providers of OpenPeak.  Finally, in the course of Plaintiff's counsel's ongoing

investigation, former OpenPeak employees and investors who possessed direct knowledge of the

wrongdoing alleged herein were interviewed.

## THE PARTIES

18.     Plaintiff Charles M. Forman is the Trustee of OpenPeak's chapter 7 estate.  His

address is Forman Holt, 365 West Passaic Street, Suite 400, Rochelle Park, New Jersey 07662.

19.     Defendant Gittleman was, at all relevant times herein, the Chief Executive Officer

("CEO") and Chairman of the Board of Directors (the "Board") of OpenPeak.  As of June 2016,

---

[3]     Dynamic Network Support ("DNS"), a Florida based IT firm, assisted in attempting to recover and access OpenPeak's electronically stored documents.  Over the course of its engagement, DNS learned that important servers were inexplicably missing from OpenPeak's Headquarters.  Of the servers that remained, DNS was only able to fully retrieve information from one because the passwords provided by OpenPeak IT personnel, including the head of Management Technology, Lee Westenberger, did not work.  Even though DNS was unable to fully access other servers it was able to determine that many had been wiped or resurfaced entirely, destroying any information that had once existed.  Among other things, all emails for the Defendants and all other OpenPeak employees prior to February 2016, as well as Company documents that resided on the Company's servers, were missing.

Gittleman held 887,305 shares of OpenPeak Common Stock, accounting for 8.32% of all outstanding shares.  Upon information and belief, Gittleman is a resident of Florida.

20.     Defendant Barclay was, at all relevant times herein, the Executive Vice President of Strategy & Business Development of OpenPeak, and served as *de facto* Chief Financial Officer ("CFO"), starting in July 2013.  Upon information and belief, Barclay is a resident of Washington.

21.     Defendant Hill joined OpenPeak as its first President on April 1, 2014.  Prior to joining OpenPeak, Hill was the Senior Vice President of Advanced Solutions for AT&T Business, where he worked directly with OpenPeak.  Upon information and belief, Hill is a resident of New Jersey.

22.     Defendant Kwon was, at all relevant times herein, the Vice President and General Counsel of OpenPeak.  As of June 2016, Kwon held 173,831 shares of Common Stock.  Upon information and belief, Kwon is a resident of Florida.

## DEFENDANTS' DUTIES

23.     To fulfill their fiduciary duties, the Defendants were required to exercise reasonable and prudent supervision over OpenPeak and its policies, practices, controls, and financial affairs pursuant to their fiduciary obligations to use the same care and diligence as would an ordinary prudent person in a similar position.

24.     By virtue of these obligations, the Defendants were required, among other things, to:

(a)     act in the best interests of OpenPeak;

(b)     operate OpenPeak in such a manner as to utilize the resources of the Company in a way which benefits OpenPeak, and not the personal interests or preferences of any Defendant;

(c)     refrain from abusing their positions of control;

(d)     not favor their own interests at the expense of OpenPeak;

(e)      in good faith, manage, conduct, supervise, and direct the business and affairs of OpenPeak carefully and prudently in accordance with United States federal and state laws;

(f)      accurately disseminate information to shareholders and creditors;

(g)      exercise reasonable control and supervision over all employees of OpenPeak;

(h)      ensure that OpenPeak did not engage in unlawful, unsafe, imprudent or unsound practices, and remain informed as to how OpenPeak was, in fact, operating; and

(i)      upon receiving notice or information of an unlawful, unsafe, imprudent or unsound practice, to make a reasonable investigation in connection therewith and to take steps to correct that practice.

25.      By reason of their positions as officers, and their ability to dominate and control OpenPeak's business and corporate affairs, the Defendants owed OpenPeak obligations of candor, fair disclosure, care, fidelity, trust and loyalty, and were required to use their ability to control OpenPeak in a fair, just and equitable manner, as well as to act in furtherance of OpenPeak's and its stakeholders' best interests or preferences.

26.      In addition, each Defendant owed OpenPeak the duty to exercise care and diligence in the management and administration of OpenPeak's affairs and in the use and preservation of its property and assets.

## BACKGROUND ALLEGATIONS

### A.      The Company

27.      OpenPeak was founded in 2002 by Defendant Gittleman and initially focused on home and office automation and IP video conferencing, and later transitioned into producing other hardware products, including tablets.

28.     By January 2012, OpenPeak abandoned its hardware business and focused on developing software for its ADAM platform, which was a program intended to allow an employee to securely access his or her company workspace on a personal mobile device.

29.     ADAM was comprised of four components: (a) Sanction, a device management program with features such as the remote wiping of data and location tracking; (b) Sector, a virtual workplace, which separated work and personal data, and provided functions such as email, calendar and contacts; (c) OpenShop, an application store, where ADAM safe applications were available for download; and (d) Analytics, for the monitoring and reporting of all managed devices and applications.

30.     All OpenPeak employees, including the Defendants, were governed by a Code of Business Ethics, which required them to "exhibit the highest ethical standards."  The Code of Business Ethics mandated that Company property "must not be used for improper personal benefit or any other improper purpose."  It further required that, "Company business records must always be prepared accurately and reliably" and that records were to be "kept in accordance with accepted accounting rules and controls at all times."  Additionally, it required fair dealing, and provided that, "[n]o employee, officer, or director should take unfair advantage of anyone through manipulation, concealment, misuse of privileged or proprietary information, misrepresentation of material facts, or any other intentional unfair-dealing practice."  As alleged herein, the Defendants repeatedly violated the Code of Business Ethics.

**B.      OpenPeak Depended upon Other People's Money**

31.     Since OpenPeak never had a product which generated meaningful revenue, it depended upon outside funding to support its operations.

32.    Between March 2011 and December 2015, OpenPeak raised over $120 million from investors.  The chart below lists OpenPeak's debt raises:

| Start Date | End Date | Type | Amount | Total to Date |
|---|---|---|---|---|
| 3/1/2011 | 4/19/2011 | 10% Convertible Secured Promissory Notes, Series E | $29,841,562.00 | $29,841,562.00 |
| 3/13/2012 | 7/30/2012 | Convertible Secured Promissory Notes, Series E | $10,260,077.00 | $40,101,639.00 |
| 3/30/2012 | 3/30/2012 | Secured Hercules Loan | $15,000,000.00 | $55,101,639.00 |
| 1/11/2013 | 1/14/2013 | 5% Convertible Promissory Notes, Series E | $575,344.53 | $55,676,983.53 |
| 1/11/2013 | 1/15/2013 | 7.5% Convertible Promissory Notes, Series E | $139,409.00 | $55,816,392.53 |
| 1/24/2013 | 11/15/2013 | 5% Convertible Promissory Notes due 2014, Series B | $19,593,128.00 | $75,409,520.53 |
| 9/27/2013 | 9/27/2013 | 5% Convertible Promissory Notes due 2014, Series BB | $5,000,000.00 | $80,409,520.53 |
| 3/5/2014 | 3/5/2014 | Hercules Investment to Repay the Initial Loan and Provide Additional Capital | $11,000,000.00 | $91,409,520.53 |
| 10/30/2014 | 10/30/2014 | Second Tranche of Secured Hercules Loan Funded | $4,500,000.00 | $95,909,520.53 |
| 1/13/2015 | 12/4/2015 | 10% Subordinated Debt Notes | $26,277,864.00 | $122,187,384.53 |

33.    OpenPeak's outstanding debt increased dramatically beginning in 2014.  As set forth in the graph below, which tracks OpenPeak's debt between March 2014 and September 2016, the Company's outstanding debt increased from $17 million in June 2014 to $26 million in December 2014 and then exploded to $102.4 million by December 2015:[4]

---

[4]    In 2015, OpenPeak issued over $26.2 million in 10% Subordinated Debt Notes.  The notes were subordinate only to Hercules Capital Inc.'s debt of $12.5 million and provided for the return of the initial investment plus 10% interest in addition to another payment of at least double the initial investment.  In total, the 10% Subordinated Debt Notes represented approximately $81.4 million of OpenPeak's debt.



34.    Gittleman was granted over 10 requests for permission to raise capital at Board meetings, including for the reasons described below:

(a)    January 17, 2013: Gittleman indicated that OpenPeak needed $2.4 million to meet its cash needs *for the month of January 2013 alone*;

(b)    July 8, 2013: Gittleman explained that OpenPeak needed about $850,000 to make payroll *that week*;

(c)    January 12, 2015: Gittleman raised concerns about OpenPeak's financial condition;

(d)    January 29, 2015: Gittleman requested to increase the cap on the issuance of 10% Subordinate Debt Notes up to $15 million, roughly two weeks after the previous cap raise;

(e)    July 28, 2015: Gittleman raised OpenPeak's continued capital problems; and

(f)    September 30, 2015: Gittleman raised OpenPeak's continued capital problems.

35.     In fact, with respect to the January 2013 bridge financing identified above, notwithstanding the fact that the Company had $80 million in debt with the inability to pay it off, Defendant Gittleman sought to raise additional capital from existing investors.  At this time it was clear to OpenPeak's officers, including Defendant Gittleman, that due to OpenPeak's extremely high burn rate and the lack of meaningful revenue, the Company needed to continually raise money to sustain operations.

36.     In order to pressure investors to provide much needed capital, the January 2013 bridge round was structured so that new investments diluted existing stakeholders.  Defendant Gittleman even prepared documents for investors showing them how much they would be diluted by if they did not invest additional funds.

37.     This strong-armed strategy was discussed at a January 27, 2013 Board meeting, during which Defendant Gittleman indicated that this was an effective way to get people to invest and that he would be interested in using this technique in the future.

38.     Gittleman and the other Defendants sought to issue more debt even after it was clear that OpenPeak had become insolvent because ADAM had fundamental problems, there was no reasonable prospect that OpenPeak could be successful , and OpenPeak was unable to meet maturing obligations as they came due in the ordinary course of business.

## C.     OpenPeak and Its ADAM Product Experienced Severe Problems

39.     Defendant Gittleman and the other Defendants misrepresented facts and omitted material information about OpenPeak and its ADAM product to stakeholders.  Defendant Gittleman and Barclay repeatedly communicated overly positive and optimistic statements about the success of ADAM, demand by customers, and expected revenues.  (*See infra* ¶¶105-141).  Contrary to their statements, ADAM suffered from substantial functionality problems.

40.     At the same time that Defendant Gittleman was praising the ADAM product,

OpenPeak was receiving poor reviews of that product from customers and employees.  The problems

were so bad that, at the end of 2013, OpenPeak scraped the then current version of ADAM, which

was written in the programming language known as Java, and replaced it with a version programmed

in the PHP language.  Thus, at the end of 2013, OpenPeak wrote down the full value of the Java

version of ADAM to zero, signaling that it was worthless.  (*See infra* ¶¶63-69).

41.     But the PHP version of ADAM fared no better than the prior Java version.  According

to several former OpenPeak employees, the ADAM program continued to experience fundamental

problems between 2014 and 2016.

42.     Employees recalled that: (a) OpenPeak products contained numerous bugs and did not

work as intended, leading to poor sales and the loss of customers; (b) the Company's officers were

not interested in the long-term functionality of ADAM – they simply wanted to be able to demo the

product to customers; and (c) the Company's officers ignored concerns raised by Company

employees regarding ADAM.

43.     Defendant Gittleman and the other Defendants misrepresented facts about ADAM to

potential business partners in an effort to sell their products.  Gittleman misrepresented to potential

customers how well ADAM worked and falsely represented that the product had features which did

not exist.  When Gittleman returned to the office after a sales call, he instructed employees to create

features within unrealistic time frames.  Former employees also believed that Gittleman and

OpenPeak over-promised and under-delivered to customers and provided a product that was often

rushed to market without the proper testing or without fixing known problems.

44.     Due to the widespread problems with ADAM since the beginning of its development,

OpenPeak was unsuccessful.  AT&T, OpenPeak's largest customer, experienced numerous problems

and communicated complaints directly to OpenPeak's officers. Even though OpenPeak may have provided licenses to customers, OpenPeak only generated revenue when licenses were activated, and only a very small percentage of licenses were ever activated. For example, even though OpenPeak provided AT&T with more than 100,000 licenses, by June 2014, AT&T's version of ADAM, named Toggle, only had approximately 154 active users. (*See infra* ¶110).

45.    BlackBerry, another important OpenPeak customer, had similar problems with ADAM. During 2014 and 2015, Blackberry had an ongoing dispute with OpenPeak and claimed that OpenPeak was in breach of their agreement due to material problems with the ADAM product.

### i.    AT&T Was Dissatisfied with ADAM

46.    During 2014 and 2015, AT&T's management team communicated its concerns about Toggle to OpenPeak's officers.

47.    Despite the positive reports provided to OpenPeak stakeholders, AT&T voiced concerns about the following, among other things: (a) the product would crash, despite the low active user count; (b) the product would not sync with other devices or programs; (c) the product was not evolving or progressing over time; (d) due to the problems, the product was not ready for distribution; and (e) due to the problems, OpenPeak was losing customers.

48.    Some of these communications are described below:

(a)    On February 27, 2014, Daniel Walsh, Senior Vice President of Global Customer Solutions and Integration at AT&T, emailed Defendant Hill, who still worked at AT&T, and others, stating, "***Toggle has crashed on me every day this week (iPhone and iPad). IT trying to figure it out . . . have wiped and reloaded several times***." He concluded the email with "no immediate fix in sight." Hill forwarded the email to Defendant Gittleman, who responded that it "sounds like an issue we had a long time ago. . . ."

(b)       On or about March 24, 2014, Walt M. Rivenbark IV, Assistant Vice President of Big Data Solution Sales & Marketing at AT&T, circulated internally at AT&T, a summary of his trial of Toggle, during which he ***experienced problems with the program, including numerous crashes and sync issues***.  After some discussion regarding Rivenbark's experience, Vice President of IoT Solutions at AT&T Michael Troiano ("Troiano"), advised Defendant Gittleman that, "***[AT&T] had a customer cancel last week because they were [also] frustrated with synch issues***."

(c)       In an August 12, 2014 email forwarded by Defendant Gittleman to Executive Director of Integrated Solutions at AT&T Sundhar Annamalai ("Annamalai"), Philip Schntrup of OpenPeak reported on ***potential customer SAP's inability to enable their product, Fiori, inside of Toggle***.  Annamalai bluntly responded to Gittleman, "I don't think we're going to be able to close on these test customers by the end of August. . . .  Good to hear on the synergies [between Fiori and Toggle], but ***there is nothing to sell at this point***.  The target date was 7/31."

(d)       On August 25, 2014, Annamalai sent an email to Andy Aiello ("Aiello") of OpenPeak and Defendants Hill and Gittleman, copying others at AT&T, discussing problems with the scalability of Toggle, stating, "[t]here is ***growing concern on the scalability of the product*** and getting killed internally from a perception standpoint.  I don't believe OP recognizes the amount of pain AT&T is taking from the sales team, care, ITO, MSS and Internal customers with regards to the collective set of issues."

(e)       On or about September 10, 2014, Annamalai sent a scathing email to Defendant Hill (now at OpenPeak), who forwarded the email to Defendant Gittleman and Aiello.  ***Annamalai vividly described the sync problems he experienced while using Toggle, including that none of the actions taken on his iPhone ever took effect*** – specifically, calendar updates and emails were never actually sent.  As a result, Annamalai failed to respond to important emails and attend

meetings.  In summary, Annamalai stated that, "[s]everal internal users have approached me telling me they tried Toggle out, but stopped using it as they weren't 100% [confident] that emails would send or their calendars would synchronize."

(f)    On October 1, 2014, an email exchange occurred between Troiano of AT&T and Defendant Hill, in which Troiano stated he received the following message in an email: "***I am seriously losing my patience with this product. . . .*** As I said to [A]bhi the other day, ***it's a GOOD thing we have 133 users active and not 133K.***"  Troiano later replied that ***AT&T*** "***is growing frustrated that the product hasn't evolved (much) this year.  Lots of promises, but it is not substantially different in Oct than it was in June. . . . You need to start asking OP some serious questions before ATT gets a big old black eye from it***."

(g)    On October 3, 2014, an exchange of emails occurred between AT&T and OpenPeak employees, including Defendant Hill and Aiello, regarding the recent Toggle experience of Chad Tursi, an Executive Director of Enterprise Mobility Management and Collaboration at AT&T.  According to the email, Tursi was scheduled to demo Toggle for a client, when, 30 minutes prior to the demo, ***his entire device was wiped out as a result of Toggle***.  Tursi, copied on the email chain, demanded an explanation from OpenPeak, and stated if he was unable to get one, he would call Gittleman himself.  Hill replied later in the thread, stating that he was "at a loss to understand what is going on with [Tursi's] device."

(h)    On July 15, 2015, Lloyd Silvern of OpenPeak sent an email to others at OpenPeak, commenting on the problems with Toggle, and stating, "***This is getting very urgent as ATT is communicating to their executive leadership serious problems***.  Eugenie . . . you will probably need to do some damage control."

(i)      On August 14, 2015, Defendant Hill received a document regarding Western Kentucky University's test of the Toggle product.  The summary, which highlighted various user experiences, trashed OpenPeak and its product.  One user even commented, "***Going forward with Toggle and rolling it out to students would be nothing short of a mistake***.  For students, Toggle is confusion, for the helpdesk, Toggle is headaches.  For IT, Toggle is a PR nightmare waiting to happen.  To put it kindly, for our intended purposes: ***Toggle is garbage, Toggle should be terminated***."

### ii.    Blackberry Was Dissatisfied with ADAM

49.    Blackberry was one of OpenPeak's most important customers and contributed to a material portion of revenues in OpenPeak's financial forecasts.  Blackberry, however, was extremely unhappy with OpenPeak and ADAM.

50.    On or about October 28, 2014, Blackberry notified OpenPeak that it was in violation of the contract, and subsequent amendments, between the two parties.  In a letter to OpenPeak, Blackberry wrote, "OpenPeak has repeatedly failed and continues to fail to resolve errors, problems, defects, malfunctions, and other deficiencies in the licensed software and customized developments within the required resolution times."  Blackberry also wrote that "the licensed software and customized developments do not operate in accordance with the functional, technical, operational, performance and quality specifications, provided in the Agreement, and technical documentation."

51.    Thus, during 2014 and 2015, as OpenPeak was raising millions of dollars, unbeknownst to investors, its major customers Blackberry and AT&T were very dissatisfied with the Company and its products.

### iii. Former OpenPeak Employees Revealed Problems with OpenPeak and ADAM

52. According to several former OpenPeak employees, there were numerous problems with the design, development, and functionality of ADAM. Former employees made clear that Defendant Gittleman misrepresented the functionality of ADAM to customers and represented that ADAM had features that did not exist. Gittleman was almost exclusively focused on closing deals with customers, with utter disregard for the reality of what the software could do and irrespective of the negative business implications that would follow as a result of the technology not being able to perform as promised. Gittleman's haphazard and reckless conduct negatively impacted the development of ADAM and contributed to OpenPeak's inability to get the software to perform correctly. Additionally, Gittleman's conduct negatively impacted OpenPeak's reputation.

53. Several former employees recalled that Defendant Gittleman and other Company officers would force developers to add new features into ADAM despite the fact that the developers told those officers that there were existing problems that needed to be addressed first. The Company's officers' refusal to address existing problems compounded the issues and made them even harder to address. This was true even for the simplest of fixes.

54. Several former employees commented that the Company's officers were "demo driven," meaning that the officers were not concerned if a product would work in the long-term, as long as they could show a potential customer something that briefly worked. Often times, these "demo versions" could not handle more than a few users. As a result of Defendant Gittleman and the officers' pressure to produce these "demo versions," the Company wound up with many small pieces of a larger program that barely worked.

55. Employees also recalled that the Company's officers, and most importantly Defendant Gittleman, would over-promise and under-deliver, such that the officers made promises

about the product to customers that they knew OpenPeak could not keep.  The former employees recalled that what customers were told about the product did not match the true state of the product.

56.     Several former employees recalled their own problems with the use of the product. One stated that his or her iPhone, which contained ADAM, would lock up entirely when rebooted. Another recalled that the program was difficult to use and was not as user-friendly as the competition.

57.     Several former employees recalled that OpenPeak was unable to deliver products on time, and even when it did deliver a product, the Company's officers knew the quality was poor, and the product contained bugs.  As a result, the former employees were left to deal with angry customers who experienced the problems with the software.

58.     Numerous former employees commented that these problems caused: (a) low license activation numbers; (b) the loss of customers; and (c) the inability of OpenPeak to sell itself or its assets.

59.     One former employee specifically commented that the Defendants would have been aware of problems with the program due to the large amount of complaints the Company received from AT&T and Blackberry.

60.     Former employees also commented that Defendant Gittleman was deceitful.  One former employee described Gittleman as a stereotypical shady salesman and said, "I would never trust him as far as I could throw him."

61.     Another former employee noted that Defendant Gittleman was very good at spin. Gittleman had people believing that OpenPeak was winning contracts and that the Company was growing, but according to the former employee, this was not true.  According to the same former

employee, Gittleman knew about the poor performance of OpenPeak's products because that employee had numerous conversations with Gittleman about the problems.

62.      According to former employees, Defendant Gittleman focused on raising money and making promises that were extremely difficult to keep instead of helping the Company develop a product that worked.  In fact, one former employee described OpenPeak as a "ship without a rudder."  The former employee elaborated by stating that the Company's officers had no plan on how to get OpenPeak out of its then current situation, or any plan on how to make its product work.

**D.      OpenPeak Determines the ADAM Java Software Is Worthless in 2013**

63.      OpenPeak's financial statements for the year ended December 31, 2013 (the "2013 Financial Statements") were audited and represented to have been prepared in accordance with accounting principles generally accepted in the U.S. ("GAAP").

64.      The 2013 Financial Statements included disclosures about OpenPeak's "capitalized software development costs."  Generally, GAAP requires that the cost of software intended to be sold, leased or marketed be expensed as incurred until the "technological feasibility" of the software product has been established.  Once the software's technological feasibility has been established and determined, the costs of coding and testing, as well as other costs of producing product masters, are to be capitalized, *i.e.*, reported as an asset, and amortized over the greater of: (a) the straight-line basis of the product's estimated useful life; or (b) the percent of the product's current-year revenues as compared to the product's anticipated future revenues.  The capitalization of such costs are to cease when the software product is available for general release to the customer.

65.      In addition, GAAP provides that capitalized software costs are to be evaluated for impairment on a product-by-product basis by comparing a product's unamortized capitalized costs to its "net realizable value," defined in GAAP as being the product's estimated selling price in the ordinary course of business, less reasonably predictable costs of completion and disposal.  The

amount by which the unamortized capitalized costs exceed the net realizable value is to be recognized as an impairment charge.

66.    The 2013 Financial Statements revealed that during 2013, OpenPeak concluded that the ADAM software was worthless, in that the net realizable value (the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion and disposal) was zero.[5] The 2013 Financial Statements disclose, in pertinent part, as follows:

### Capitalized software development costs

During January 2011, management determined it had established the technological feasibility of its ADAM software and began to capitalize related research and development costs which included salaries, employee benefits, consulting and other costs directly related to programming and testing activities, and allocated amounts of certain indirect costs such as rent expense.  During March 2012, the Company ceased capitalizing such costs when the software was available for sale to customers and began amortizing the capitalized cost of an expected period of benefit of 3 years. During 2013, the Company did not sell or license any of its ADAM software application so the Company redeveloped the ADAM software application in order to meet current market and technology demands.    As a result, **management determined that the carrying value of the capitalized ADAM costs was impaired because the estimated future net realizable value related to this initial version of ADAM would not be recovered during the estimated period of benefit, and recognized an impairment charge in the accompanying statements of operations of approximately $4,100,000 during the year ended December 31, 2013, which was included in operating expenses**.

Capitalized software development costs consisted of the following at December 31, 2013 and 2012:

|  | 2013 | 2012 |
|---|---|---|
| Gross carrying amount | $    9,637,692 | $    9,631,817 |
| Less: accumulated amortization | (5,547,398) | (2,377,454) |
| Less: impairment | (4,090,294) | - |
|  | $          - | $    7,254,363 |

Amortization expense during the years ended December 31, 2013 and 2012 was approximately $3,170,000 and $2,377,000, respectively, and was included in research and development expenses in the accompanying statement of operations.

---

[5]    OpenPeak's unaudited financial records reveal that the Company's capitalized software costs totaled $4.2 million and $0 as of November 30, 2013 and December 31, 2013, respectively. Accordingly, the impairment charge was recorded in December 2013.

67.     The Company's write-down of the entire balance of its capitalized software development costs coincided with changing ADAM from the programming language of Java to the programming language of PHP.  The change was internally justified on the basis of keeping current with the industry, but former employees disputed this justification.  The change, however, did not improve the performance of ADAM since the PHP version also had fundamental problems that rendered it inoperable.

68.     One former employee recalled that the PHP version of ADAM was created in a rush and was not stable, but became OpenPeak's main product.  Several OpenPeak employees disagreed with the change, felt the project was being mismanaged, and, as a result, expressed their concerns to OpenPeak's officers.

69.     By this point, OpenPeak's financial condition was extremely weak, the Company was insolvent, and the situation even worsened throughout 2014 and 2015.[6]  OpenPeak had abandoned the ADAM product coded in Java and the PHP version did not function adequately.  OpenPeak's assets were below liabilities, OpenPeak's asset deficiency, meaning the difference between liabilities and assets, began to grow, and OpenPeak was unable to meet debt obligations without raising additional capital.[7]

---

[6]     Defendants Gittleman, Barclay, and Kwon have admitted that OpenPeak was insolvent throughout 2014 and 2015.

[7]     According to Delaware case law, "[i]nsolvency may be demonstrated by either showing (1) 'a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof,' or (2) 'an inability to meet maturing obligations as they fall due in the ordinary course of business.'" *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, C.A. No. 1456-N, 2006 Del. Ch. LEXIS 164, at *46-*48 (Del. Ch. Sept. 1, 2006) (citations omitted).

**E.      Potential Deals for the Sale of OpenPeak Fell Through Because of the Defendants' Lack of Credibility During Negotiations**

70.      Beginning in 2012, OpenPeak was approached by companies that had an interest in acquiring the Company or its assets.

71.      Any meaningful discussions with a potential acquirer followed a similar pattern. Those companies were initially interested in OpenPeak based on Defendant Gittleman's misleading statements about the Company, its business, its software, and the value of its intellectual property. Gittleman and the Company's officers misrepresented or hid facts about OpenPeak and its products to potential acquirers giving them the false initial impression that OpenPeak was much more valuable than it really was.  Those entities would then express an interest in OpenPeak and perform due diligence.

72.      Once those companies performed due diligence, however, they learned the truth and were no longer interested – regardless of the cost – because the Defendants had lost all credibility. During due diligence, those entities discovered that OpenPeak's intellectual property was not valuable, OpenPeak's software had problems, and OpenPeak had very few active users.  Below are two examples.

**i.      Citrix Systems, Inc.**

73.      The Defendants presented a misleading picture of OpenPeak in order to entice Citrix Systems, Inc. ("Citrix") to negotiate a deal to acquire the Company.  As discussed below, the deal fell apart after Citrix learned about the deception by the Defendants.

74.      During 2012, Citrix evaluated OpenPeak as a potential acquisition candidate.  At the first meeting between the two companies, Gittleman provided Citrix with information related to OpenPeak's financial results, the number of software licenses sold through AT&T, and the core

features of OpenPeak's mobile platform, including those claimed to be "game changing" and unique to OpenPeak.

75.     Citrix was interested in exploring opportunities based on Defendant Gittleman's representations.  One of the key drivers for Citrix's interest was the purported ramping up of revenue from the sale of licenses through AT&T.

76.     On May 6, 2012, Citrix sent OpenPeak a non-binding letter of intent, which included a purchase price in an amount not to exceed $500 million.

77.     By July 2012, Citrix was in the midst of conducting due diligence, but needed additional time to review "ADAM's business, including the AT&T Toggle account."  A former employee recalled that during due diligence, in an attempt to impress Citrix representatives when they visited OpenPeak's offices, the Defendants hired between 30-40 actors to pretend they were employees to make it appear that the Company was busier and more impressive than it actually was. According to the former employee, Defendant Gittleman joked about the hiring of the actors and recounted that he did a similar thing at a previous company named StorageApps.

78.     As part of the due diligence, Citrix scheduled a meeting with AT&T to discuss its level of interest and plans for the OpenPeak software that AT&T branded as Toggle.  Just prior to the scheduled site visit at AT&T, a member of the Citrix team was inadvertently copied on an email from AT&T to OpenPeak.  That email contained the actual number of licenses sold by AT&T, the number of licenses activated, and the revenue generated by OpenPeak to date.  The numbers for each category were substantially lower than what OpenPeak had reported to Citrix.  Moreover, according to a former employee, the Defendants took the best-case-scenarios projected by AT&T and presented them to Citrix as though they were the conservative, floor projections.

79.    In addition to overstating OpenPeak's financial performance and projections, the Defendants also overstated the value of OpenPeak's intellectual property.  They represented that OpenPeak's intellectual property was valued between $200-$300 million.  When Citrix performed due diligence it determined that the intellectual property portfolio was valued at no more than $2 million and likely less.

80.    The Defendants also misrepresented the functionality of OpenPeak's products.  Citrix found that ADAM was not mature in its development, was not scalable (meaning it could not grow to accommodate the number of users envisioned), would require at least nine months of remediation to get it working properly, and that it suffered from deep "go-to-market" flaws (meaning the ability to bring the product to the market for sale).

81.    Finally, unbeknownst to stakeholders, Defendant Gittleman was negotiating a $50 million payment in Citrix stock for himself and other Company employees if certain conditions were met.

82.    When Citrix learned that the Defendants had misrepresented facts about OpenPeak, they lost credibility and Citrix eventually walked away from the deal.  Defendant Gittleman hid from stakeholders the true reasons why the Citrix deal fell apart and instead told them that the Citrix offer was too low and that OpenPeak was holding out for a better price.

**ii.    Synchronoss Technologies, Inc.**

83.    During 2014, the potential acquisition of OpenPeak by a company named Synchronoss Technologies, Inc. ("Synchronoss") followed a pattern very similar to that of the potential Citrix deal.  As with the Citrix deal, Synchronoss was initially interested in OpenPeak based on misrepresentations by the Defendants about OpenPeak's financial performance and prospects.  Furthermore, as with the Citrix deal, the Defendants' lack of credibility was a primary reason the deal did not go through.

84.      In or about October 2014, the Company received a preliminary written indication of interest for an acquisition of OpenPeak by Synchronoss for $300 million, consisting of 60% cash and 40% stock.  Once Synchronoss performed due diligence and learned the details about how OpenPeak would only be able to recognize revenues from AT&T once 225,000 licenses were activated, its interest in OpenPeak subsided.

85.      On November 11, 2014, during Synchronoss' due diligence for the deal, Defendant Barclay sent an email to Defendants Gittleman and Hill stating, "[Synchronoss is] worried about our 225k license 'hole[.]'  They realize that before we get 225k active licenses, revenue will be zero."  Thus, Synchronoss became aware that OpenPeak would not make any money from sales to AT&T until AT&T activated all 225,000 licenses it prepaid for under Amendment No. 6 to the Master Resale Agreement.

86.      Moreover, Defendant Gittleman reported during a November 18, 2014 Merger & Acquisition Committee Meeting that it was the large backlog of over 800,000 licenses already provided by AT&T to end-users, which would not generate revenue until they were activated, that sparked Synchronoss' desire to better understand the process and timeline for these activations and how OpenPeak would be paid.

87.      On December 29, 2014, Defendant Gittleman confirmed to the Board that activity relating to the proposed acquisition by Synchronoss had terminated.  According to internal communications sent by Synchronoss' Chairman and CEO to his own deal team, he "could not get past the lack of visibility in the business" and the ***Officers' lack of*** "***credibility . . . communicated during the process***."  Gittleman, however, falsely told investors that negotiations ended due to a drop in the price of Synchronoss' stock, which made a deal from Synchronoss' perspective undesirable.

## F.   The Defendants' History of Wasteful Spending

88.    Defendant Gittleman and the other Defendants had a history of lavish and wasteful spending, dating back to the formation of the Company.  Although some of this spending pre-dates the relevant time period for many of the alleged causes of action, it nonetheless sheds light on the type of practices the Defendants were engaged in.

89.    For example, according to former employees, prior to 2014, Defendant Gittleman frequently flew on private jets for all his travel needs with costs in the hundreds of thousands of dollars.  Gittleman spent in excess of $654,000 on over 30 private charters between January 2012 and January 2013 alone.  Each trip averaged in cost from $15,000 to $22,000.  On several occasions, including flights on March 4, 2012, March 10, 2012, July 22, 2012, and October 21, 2012, Gittleman traveled with family members, including his parents, children and ex-wife.  On other occasions, including flights on April 21, 2012, May 11, 2012, September 5, 2012, September 11, 2012, September 12, 2012, October 7, 2012, October 28, 2012 and October 31, 2012, Gittleman chartered a plane for eight passengers even though he traveled alone with only his secretary, Stacey Bradford.

90.    Defendant Gittleman held Company meetings at his residence and charged the Company thousands of dollars in rental fees, putting his own interests in front of the Company.

91.    Defendant Gittleman bought approximately fifteen Apple Watches for members of his inner circle at the Company, including the front desk receptionist, with Company funds.  The watches ranged in price from $450 to $750, and served no legitimate business purpose.

92.    The Company had a surplus of high-tech gadgets that went unused.  For example, OpenPeak's headquarters had an office-sized supply closet filled with large screen TVs, computers, and a pool table, which appeared to be purchased and forgotten about.

## SUBSTANTIVE ALLEGATIONS

93.     The paragraphs above (¶¶31-92) provide a glimpse into the workings of OpenPeak and how Gittleman and the other Defendants ran the Company in a reckless manner, in violation of the Company's Code of Conduct, and to benefit themselves to the detriment OpenPeak.  Against this backdrop – a Company that constantly needed funding to keep it afloat, with a flagship product that didn't work and was deemed worthless, that was run by officers who misrepresented facts about the Company to both customers and stakeholders and treated the Company as a cash cow for their own personal interests – Plaintiff makes the following substantive allegations in support of this Complaint.

**A.      The Defendants Treated OpenPeak as Their Personal Piggy Bank**

94.     Despite the financial hardships facing OpenPeak, the problems experienced by customers, and its inability to generate any meaningful revenue, Defendant Gittleman and the other Defendants wasted corporate assets, as they enjoyed lavish lifestyles funded at the Company's expense.

95.     Defendant Gittleman (and others) borrowed money from the Company that remains unpaid, and wasted corporate assets and enriched themselves by using Company money to pay for extremely expensive hotels and pay the salaries of friends for unnecessary work on defunct projects. Gittleman recklessly spent OpenPeak's money on himself and those close to him, with utter disregard for what was in the best interest of the Company.  Gittleman and the other Defendants also wasted Company assets and put their own interests before the interests of OpenPeak by drawing exorbitant salaries without justification.  Much of this wrongful conduct occurred within the two years preceding OpenPeak's bankruptcy.

### i.    Improper Salaries

96.    Defendants Gittleman, Kwon, Barclay and Hill were able to fund their extravagant lifestyles, in part, based on the large salaries they drew from OpenPeak.  Despite all the problems at OpenPeak, including never having a truly functional product, between 2012 and 2016, the four collectively drew salaries of $6.98 million.

97.    Specifically, during 2015, as the Company was asking stakeholders to invest more money to keep the Company afloat, and as customers were constantly complaining about ADAM, the four drew salaries in excess of $1.6 million.  Defendants Gittleman and Hill collected $475,000, Defendant Kwon collected $360,000 and Defendant Barclay collected $350,000.  The Defendants likely collected similar salaries in 2014, and were set to make a similar amount in 2016.

98.    In early 2015, OpenPeak's largest secured creditor, Hercules Capital Inc. ("Hercules"), retained The Durkin Group to conduct a field audit of OpenPeak.  The Durkin Group commented on OpenPeak's wasteful spending, including officer salaries.  A February 3, 2015 email from Tamara Herder of The Durkin Group to Mark Roesler of Hercules, stated that OpenPeak had a "total of 165 employees.  Review of the 3-months ended 12/31/14 disbursements journal noted $5,400M in payroll disbursements.  This seemed huge for only 165 employees."  In an internal Hercules email dated February 4, 2015, one employee commented that, with respect to "[p]ayroll [] these folks have 6 people that make in excess of $300K [. . .](top 2 make $475K each and 4 more make $300K to $350K each). . .they pay $110k per month on the building in Boca . . . nice but half empty."

### ii.    Unpaid Loans

99.    Defendants Gittleman and Kwon received loans from the Company that were never repaid.  On September 22, 2008, OpenPeak issued a Full-Recourse Promissory Note to Gittleman in the amount of $199,864.67.  On September 22, 2013, OpenPeak issued Full-Recourse Promissory

Notes to both Gittleman and Kwon in the amounts of $130,342.40 and $72,282.64, respectively. The Trustee is entitled to recover the full, unpaid amounts of all such loans as outstanding receivables owed to the Company.

### iii.    Improper Spending

100.    According to a former investor in OpenPeak, Defendant Gittleman would spend as much as $75,000 on a villa at the MGM Mansion in Las Vegas during the Consumer Electronic Show ("CES"), which he traveled to by private jet and attended each year.  The MGM Mansion is reserved for the "highest of rollers" and has 29 individually designed Mediterranean themed villas ranging from 2,400 square feet to 12,000 square feet.  Even though the villa could accommodate numerous guests, only Gittleman and his secretary, Stacey Bradford, would stay there, wasting Company funds.

101.    Defendant Gittleman caused OpenPeak to waste additional money on separate rooms for other OpenPeak employees in the regular portion of the MGM hotel, even though they could have comfortably stayed in villa.  According to a former employee, this was typical of Gittleman's spending at CES until at least 2015.

102.    In addition to wasting corporate assets by causing OpenPeak to fund his extravagant lifestyle, Defendant Gittleman caused the Company to spend money, needlessly, on corporate projects and salaries for projects that had no legitimate business purpose.  For example, by the beginning of 2014, OpenPeak had already abandoned the Java version of ADAM for the PHP version, when it wrote the Java version of ADAM down to $0.  Nevertheless, Gittleman continued to waste money on the development of the Java version of ADAM and paid employees who were his friends to work on that project, even though it was not for a legitimate business purpose, as the Company had already determined it was worthless.  Former employees could not understand any legitimate reason why Gittleman was still putting resources into the Java version.  According to one

former employee, there was a group of employees who were close to Gittleman who were being paid but served no legitimate business function. This continued through at least 2015.

103.    The Company's officers also used their American Express cards to fund personal, non-business related expenses. From at least 2012 through OpenPeak's bankruptcy in 2016, they caused OpenPeak to fund tens of thousands of dollars in personal expenses on things such as entertainment (*i.e.*, movie, concert and theater tickets, trips to Disneyland and Legoland, country club memberships, and other leisure or entertainment activities), personal needs (*i.e.*, groceries, clothing, shoes and items ordered from Amazon), health-care needs (*i.e.*, gym memberships, spa treatments, shaving club memberships and medical bills), and other non-work related expenses (*i.e.*, items from Tiffany & Co. and items from various mail order retailers). Defendant Gittleman's monthly American Express charges regularly exceeded $50,000 and exceeded $100,000 on numerous occasions. Defendant Gittleman's secretary, Stacey Bradford, made similar personal purchases on an American Express credit card linked to Gittleman's account.

104.    The Defendants' wasteful and reckless spending contributed to OpenPeak's financial problems leading to its bankruptcy.

**B.    The Defendants Misrepresented Facts to Stakeholders and Investors and Breached Their Duty of Candor**

105.    The Defendants repeatedly misrepresented facts to Company investors regarding OpenPeak's business, financial condition, projections, customers' views of OpenPeak's products, and OpenPeak's ability to sell the business or its assets. These misrepresentations constitute breaches of the fiduciary duty of candor and disclosure and harmed the Company.

106.    Defendant Gittleman consistently made OpenPeak and its products sound much better than they really were, greatly exaggerated the performance of the Company and the adoption of

ADAM, and mischaracterized the likelihood that the Company could easily be sold for hundreds of millions of dollars.

### i. Misrepresentations Regarding the Adoption of ADAM and Related Potential Revenue

107.    The Defendants grossly overstated the popularity and utilization of OpenPeak's products as well as the financial projections that flowed from the adoption of OpenPeak's technology in order to obtain capital from investors.

108.    In order to portray OpenPeak in a positive light to investors, Defendant Gittleman stressed the number of licenses which were transferred to customers, such as AT&T, which made it appear as though the Company was doing well and that there was strong demand for ADAM. This was misleading, however, because even though a large number of licenses were transferred, only a small portion of those licenses were activated. Thus, the number of active users of the software was a tiny fraction of the total number of transferred licenses, and demand was much weaker than represented.

109.    Furthermore, regardless of how many licenses were transferred (or sold), OpenPeak would only generate revenue when licenses were activated. Nevertheless, in an effort to confuse investors, Gittleman and the other Defendants sometimes referred to transferred licenses as being sold, even though those licenses were not activated. As one former employee noted, there was gamesmanship surrounding the use of the terms "license" and "active user" as well as with the accounting for the sale of a license. According to this former employee, the sale of a license was not reflective of a user of a license. OpenPeak could sell a customer one thousand licenses, but that did not mean that the customer had one thousand people using the product. In fact, the customer may have had only two people using the product, merely for testing purposes.

110.    For example, on or about December 18, 2014, Defendant Gittleman communicated to an investor that AT&T had signed contracts for 1,000,000 licenses, and that the largest client for Toggle thus far was Home Depot, with 150,000 licenses.  This was misleading because Gittleman failed to disclose that active users were a different metric than the numbers of licenses provided to customers and that active users were essentially non-existent.  In fact, the day before, in a December 17, 2014 email from Mel Richardson of AT&T to Defendants Barclay and Hill, Richardson reported that, "[a]s of the end of June we had 154 active users.  As of the end of September we had 296 active users.  Therefore the net new users for 3Q2014 was 142."

111.    On January 13, 2014, Defendant Barclay emailed investor Hercules concerning OpenPeak's December 2013 launch of the latest version of Toggle and falsely stated that, "it is already off to an amazing start.  It was clear this week that Toggle has become the core of . . . [AT&T's] enterprise mobility strategy."  He added that the latest version of Toggle allowed for a "secondary voice line for business use as well as bill[ed] all business data traffic directly to the enterprise.  This is a game changer for AT&T and none of our competitors can do this!!!"  The email also touted that "AT&T, Blackberry and Deutsche Telekom have all adopted [OpenPeak's Sector ecosystem] as the standard for enterprise mobile security."

112.    Defendant Barclay's January 13, 2014 statements were misleading because Toggle had not become the "core" of AT&T's strategy and the identified companies had not adopted the Sector ecosystem as the standard for their enterprise mobile security.  To the contrary, OpenPeak's customers had experienced major problems with ADAM, including AT&T, who experienced problems with Toggle's split-billing feature and Blackberry, who also experienced similar problems.  In fact, during sworn deposition testimony regarding this document, Barclay could not remember if Toggle was even usable at this time.

113.    Defendant Gittleman sent a similar email to another investor the following day, reiterating that Toggle was the core of AT&T's enterprise mobility strategy and adding that all of OpenPeak's "major partners have now completed their full launch of the products in late Q4 and we are already seeing growing pipelines, customer wins and revenue." This email was misleading for the same reasons identified above.

114.    On April 28, 2014, Defendant Barclay represented by email to April Young of Hercules that, "revenue from AT&T and BlackBerry have been going fantastic!" This was misleading for the same reasons identified above.

115.    On October 8, 2015, Defendant Barclay emailed an investor regarding a deal with the United States Marine Corps, stating, in pertinent part, "[l]ast week [OpenPeak] also closed a huge deal with the U.S Marine Corp[s] as the platform to deliver secure applications and data to up to 300K personnel." This was misleading because, in reality, the USMC simply agreed to test ADAM under an "enterprise pilot" program for 220 licenses.

116.    Around that time, an OpenPeak presentation made similar representations regarding how Hilton Hotels had signed on for 50,000 licenses. This was misleading because, in reality, Hilton refused to sign *any* contract with OpenPeak, and simply agreed to test 100 licenses of ADAM for a period of four months.

### ii.    The Defendants Issued Projections Without Reasonable Basis

117.    In connection with their fundraising efforts, the Defendants prepared and circulated financial projections. Those projections, however, were based on unsupportable assumptions and were not realistic. OpenPeak's projections were initially prepared by its CFO Lou Salamone ("Salamone"). During early to mid-2013, however, Defendant Barclay took over the preparation of the projections because Defendants Gittleman and Barclay wanted to create projections that were more aggressive than those prepared by Salamone. Thereafter, Barclay prepared the projections, and

along with Gittleman, presented the projections to investors. Salamone ultimately resigned from OpenPeak in July 2013 because Barclay took over making the forecasts and presentations to investors.

118.    Defendants Gittleman and Barclay knew that the projections were based on unrealistic assumptions. OpenPeak's Vice President of Finance, Steven Richards ("Richards") was responsible for creating the projections by entering the numbers reported to him into a spreadsheet. Richards recalled that he "never believed that [OpenPeak] would hit their forecast numbers" and that he raised concerns on many occasions about the likelihood that OpenPeak would not meet its forecast, but his concerns were generally ignored. Others, including former CFO Salamone, similarly expressed their disbelief to the Company's officers. Richards recalled that Salamone had expressed to both Barclay and Gittleman that he was skeptical that OpenPeak's forecasts were attainable.

119.    Richards also recalled that he was told "[w]ell, we have to get to it [meaning the forecasted numbers]. *We want to have investors come in at this valuation, so we need to have this much sales to justify the valuation*." Richards "was concerned that *David Barclay was basically doing whatever he needed to do to make sure he was getting investor money*." Realizing the projections were totally unrealistic, Richards stated that he would try not to forward them to investors, and tried not to present anything directly to them.

120.    In fact, in an April 10, 2014 email exchange between Richards and Defendant Barclay, Richards questioned the Company's ability to meet its forecasts. Barclay wrote that it would "be great to get in front of [the] board and show how we beat our numbers!!!" Richards, one minute later, replied "?  We didn't even come close to beating our Board forecast. We projected almost 100k licenses, including 50k+ from BB and even some licenses from DT."

121.    Examples of the Defendants' misrepresentations regarding projections are set forth below:

(a)    On or about January 22, 2014, Defendant Barclay emailed Hercules representatives and attached a January 2014 Executive Overview which made statements about OpenPeak's software, business opportunities, and revenues.  The overview forecasted, for 2014, total revenue of $72,928,000, gross profit of $64,916,000, EBITDA of $35,295,000, and millions of license sales.  In reality, OpenPeak's revenues from 2012-2016 **combined** did not even come close to $72.9 million, and OpenPeak did not come close to millions of license activations.

(b)    Hercules met with OpenPeak on or about February 11, 2014.  Defendants Gittleman and Barclay represented to Hercules that OpenPeak would have 864,000 Toggle license sales to AT&T in 2014 alone, equating to $43 million in revenue for 2014.  In actuality, total sales for 2014 were $16.5 million, less than half of the $43 million projected for AT&T alone.

(c)    OpenPeak also provided Hercules with projections for the fourth quarter of 2014.  The projections forecasted revenues of $9,019,278, $9,707,403, and $13,753,978, during the months of October, November and December 2014, respectively.  The actual revenues were markedly different, consisting of $1,364,999, $695,641 and $124,197 during the months of October, November and December 2014, respectively.  The chart below highlights the stark difference between projected revenues and actual revenues during the fourth quarter of 2014:

| Revenues | October | November | December |
|---|---|---|---|
| Projected | $9,019,278 | $9,707,403 | $13,753,978 |
| Actual | $1,364,999 | $695,641 | $124,197 |
| Overstatement | 661% | 1,395% | 11,074% |

122.    On December 18, 2014, Defendant Hill emailed OpenPeak's Bryan Gillis regarding the Company's inability to forecast active users.  Hill wrote, "I hate to start the morning bitching but this sucks.  [T]he sales teams ability to forecast active users sucks.  [D]o you really believe we are

going to get to 1000 total users by EOY.  I am going to start firing sales reps if they can't get their

shit together and forecast worth a damn.  [O]ur credibility is near zero at this point."

123.    On January 20, 2015, Defendant Barclay emailed an investor and provided

OpenPeak's "preliminary draft 2015 forecast."  According to the forecast, OpenPeak projected total

revenues of $6.6 million in the first quarter of 2015, $13.2 million in the second quarter of 2015,

$19.1 million in the third quarter of 2015, and $25.2 million in the fourth quarter of 2015.  In reality,

OpenPeak barely cleared $10 million in revenue during all of 2015.

124.    The Defendants lacked a reasonable basis to make each of the projections set forth

above because ADAM did not work as intended, customers were dissatisfied with ADAM and

complained about the quality of the product, and there were extremely low activation numbers with

no reason to expect any meaningful change.

### iii.    The Defendants Misrepresented the Value of OpenPeak's Intellectual Property

125.    The Defendants misrepresented the nature and value of the Company's patents to

stakeholders as well as potential suitors.  Defendant Gittleman claimed to stakeholders that the

Company's intellectual property could be sold for $200-$300 million and was extremely marketable

to companies such as BlackBerry, VMware and others.  A material factor inducing investors to get

involved with OpenPeak was the near guarantee by OpenPeak that its patent portfolio could be sold

for $200 million or greater.

126.    OpenPeak's intellectual property, however, was worth merely a fraction of the value

represented by Defendant Gittleman.  Indeed, Citrix evaluated OpenPeak's intellectual property and

determined that it was worth no more than a maximum of $2 million. Citrix's valuation was in line with the amount OpenPeak ultimately sold the portfolio for.[8]

127.    In addition to overstating the value of OpenPeak's patents, Defendant Gittleman misrepresented that its patents were original. In reality, much of OpenPeak's patents were part of the core technology of competing companies including BlackBerry, VMware, and others.

### iv.    The Defendants Manipulated OpenPeak's Financial Results to Make the Company Appear More Attractive to Potential Acquirers

128.    The Defendants manipulated OpenPeak's financial results to make the Company appear more attractive to investors and potential acquirers.

129.    Richards recalled that OpenPeak's officers were "doctoring" the Company's historical financials. According to Richards, "instead of putting what you would normally put as a monthly close[,] what the revenue should be based off of GAAP, they were putting what they wanted to for the last two months that I was there or three months that I was there."

130.    For example, during October 2014, the Company restated its previously reported June 2014 financial results by reducing revenues by more than $1.9 million and then, on or about January 15, 2015, restated its financial results for the periods of July 2014 through October 2014 by collectively reducing revenues by nearly $8 million. A significant portion of those revenues were derived from an $8 million prepayment by AT&T for the transfer of 225,000 licenses from OpenPeak.

131.    The Company's revenues for the periods of July 2014 through October 2014 as originally reported and as restated are set forth below:

---

[8]    On April 19, 2017, the Bankruptcy Court ordered the sale of OpenPeak's intellectual property to the highest bidder, for $1,025,000.

| Revenues | June | July | August | September | October | Total |
|---|---|---|---|---|---|---|
| As Reported | $2,377,306 | $1,983,369 | $3,460,205 | $4,411,232 | $3,494,115 | $15,726,227 |
| As Restated | $431,619 | $207,360 | $1,504,796 | $2,280,299 | $1,364,999 | $5,789,073 |
| Difference | $1,945,687 | $1,776,009 | $1,955,409 | $2,130,933 | $2,129,116 | $9,937,154 |

132.    The Defendants removed the $8 million in revenue from the AT&T agreement payment, as well as nearly $2 million of other revenue from prior months, so they could reuse those revenues in future months.  The Defendants did not restate OpenPeak's financial results out of concern that they were not proper as initially recorded.  In fact, Defendant Kwon recalled that: "My understandings is that the recognition of the $8 million, when it was received, was in accordance with GAAP."  Defendant Barclay contended the revenue was properly booked as initially reported.

133.    The Defendants improperly and deceptively reused the previously recorded revenue in order to make OpenPeak appear more appealing to a potential investor or suitor.  Indeed, according to Defendant Barclay, the restatement, which shifted revenue from 2014 forward into 2015, was carried out because it "would position OpenPeak more favorably to a potential future acquirer and/or investor."  Barclay reiterated his understanding, citing to a January 23, 2015 email in which he recounted, "I did have a call with [Hercules] a few weeks ago (John and Mark were on it) on January 6th when I discussed with them that it might be in all of our best interests to defer the $8M of the revenue we received from AT&T last year and instead recognize it in 2015 so that *it would help show growth going into this year*."  He also confirmed that a restatement would be "in all of our best interests because our goal was to position the company for sale" and that "to defer [the] revenue would smooth a large spike in revenue showing [a] stream of income every month."

134.    Defendant Kwon also recalled that the restatement occurred "to make the financials more even, and frankly, more attractive to a particular buyer."

135.    The Durkin Group, which was hired to conduct a field audit of OpenPeak following the restatement, confirmed Defendants Barclay and Kwon's understanding in its report – that

OpenPeak restated its financial results in order to present a more level stream of revenue to make

OpenPeak more desirable to potential acquirers.  The below chart reflects OpenPeak's revenue as

reported during 2015, which included the recycled revenue from 2014:

| Quarter | Revenue |
|---|---|
| First Quarter 2015 | $41,194 |
| Second Quarter 2015 | $7,890,685 |
| Third Quarter 2015 | $1,017,534 |
| Fourth Quarter 2015 | $3,398,538 |

136.    Armed with the recycled revenue from 2014, the Defendants raised more than $26

million from investors during 2015.  The chart below lists OpenPeak's reported revenue and amount

raised from investors during each quarter of 2015:

| Quarter | Revenue | Amount Raised |
|---|---|---|
| First Quarter 2015 | $41,194 | $10,900,000 |
| Second Quarter 2015 | $7,890,685 | $7,295,000 |
| Third Quarter 2015 | $1,017,534 | $6,392,864 |
| Fourth Quarter 2015 | $3,398,538 | $1,690,000 |

137.    Unbeknownst to stakeholders and potential investors, on or about January 23, 2015,

after Hercules learned about the restatement of OpenPeak's financials, Hercules communicated its

desire to pull out its investment.[9]

138.    Richards also recalled a time when OpenPeak improperly recorded service revenue.

Based on communications he had with Toggle's product teams, Richards knew how far along the

---

[9]    Plaintiff's allegations regarding the manipulated financials are materially different than the
allegations previously made by Hercules in *Hercules Capital, Inc. v. Gittleman et al.*, Case No. 16-
CIV-81663-DMM (S.D. Fla.).  Hercules focused its allegations on OpenPeak misrepresenting its
financial statements and violating GAAP for the period July 2014 to October 2014, to induce it into
making additional investments in the Company in October 2014.  Plaintiff, on the other hand, does
not allege the Defendants misrepresented those financial statements or violated GAAP when they
were initially reported.  Rather, Plaintiff alleges misrepresentations occurred when the Defendants
restated those initially reported results to smooth out the Company's future revenues to make them
more attractive to investors and potential acquirers during 2015.  In sum, Hercules alleged the
restatement shows those financial statements were false when initially reported.  Plaintiff does not
allege the financial statements were false as initially reported but became false when the financial
statements were restated.

product was relative to milestones that needed to be met in order to recognize revenue.  Richards recalled that he spoke to Defendant Barclay on or about April 4, 2014 about the fact that there were no documents to support Barclay's claim that OpenPeak had completed the requisite service milestones to warrant the recognition of revenue.  Richards recalled that Barclay never provided him with the proof Richards deemed necessary for the recognition of the revenue, but the revenue was still recorded.

### v.    The Defendants Misrepresented Facts Concerning the Ability for OpenPeak to be Sold

139.    The Defendants repeatedly misrepresented to stakeholders that OpenPeak could be sold for hundreds of millions of dollars when that was not true.

140.    During 2015, a firm named Evercore Partners was brought in to facilitate a sale of the Company.[10]   One former investor participated in a three-way call with Gittleman and a representative of Evercore in the summer of 2015 during which Gittleman and the Evercore representative falsely represented that OpenPeak had a firm offer from VMware for $180 million.

141.    Despite these representations, the Defendants were not able to consummate a deal near the amount specified because the Defendants lacked a reasonable basis to make such optimistic statements regarding their ability to sell OpenPeak at the amounts specified.

### DAMAGES

142.    As a result of the Defendants' wrongful conduct, including the deceptive and unscrupulous manner in which the Defendants operated the Company and solicited investments, OpenPeak was damaged.

---

[10]   One former investor learned after OpenPeak's bankruptcy that Evercore eventually fired OpenPeak when Evercore realized they would be unable to effectuate a sale of OpenPeak.  The Defendants failed to disclose this information as they were raising money from investors during 2015.

143. First, the breaches of fiduciary duty by the Defendants caused the failure of ADAM. Instead of operating the Company and dealing with customers in an appropriate manner, Defendant Gittleman, the other Defendants, and other Company officers repeatedly deceived customers about the functionality of ADAM, failed to properly address issues with the software, and created an environment in which the Company could not succeed.  The Defendants are liable for damages arising from OpenPeak's failure as an ongoing entity in an amount to be determined at trial by experts.

144. Second, the Defendants are liable for the damages arising from the Defendants wasting corporate assets, treating the Company as their personal piggy bank, and taking money out of the Company that was never repaid.  With respect to the waste of corporate assets, the below represents the damages sought by the Plaintiff:

(a)  the salaries for Defendants Gittleman, Hill, Barclay and Kwon between September 2014 and September 2016, estimated at over $2 million;

(b)  hotel stays at CES in excess of $200,000; and

(c)  hundreds of thousands of dollars in salaries and related expenses for the continued development of the ADAM program in the programing language Java, despite replacing it with a PHP version.

145. Third, the Defendants are liable for the damages arising from their fraudulent transfers, for *inter alia*, the following:

(a)  the salaries for Defendants Gittleman, Hill, Barclay and Kwon between September 2014 and September 2016, estimated at over $2 million;

(b)  over $202,000 in personal loans made to Defendants Gittleman and Kwon; and

(c)      hundreds of thousands of dollars in salaries and related expenses for the

continued development of the ADAM program in the programing language Java, despite replacing it

with a PHP version.

## COUNT I

### Breach of Fiduciary Duty of Disclosure and Candor
### (Against Defendant Gittleman)

146.      To state a claim for a breach of the duty to disclose, Plaintiff must (1) identify a

material statement or representation in a communication contemplating stakeholder action (2) that is

false.

147.      As described in detail herein, Defendant Gittleman was a fiduciary of the Company

and had a fiduciary duty to ensure that OpenPeak disseminated accurate, truthful and complete

information to its stakeholders.  Defendant Gittleman knowingly caused the Company to disseminate

to its stakeholders materially misleading and inaccurate information about the condition and

performance of the Company, including in connection with his attempts to obtain investments in the

Company (¶¶32-34), as described below:

(a)      On or about December 18, 2014, Defendant Gittleman communicated to an

investor that AT&T had signed contracts for 1,000,000 licenses, and that the largest client for Toggle

thus far was Home Depot, with 150,000 licenses.  This was misleading because Gittleman failed to

disclose that active users were a different metric than the numbers of licenses provided to customers

and that active users were essentially non-existent.  In fact, the day before, in a December 17, 2014

email from Mel Richardson of AT&T to Defendants Barclay and Hill, Richardson reported that,

"[a]s of the end of June we had 154 active users.  As of the end of September we had 296 active

users.  Therefore the net new users for 3Q2014 was 142."  ¶110.

(b)    On January 14, 2014, Defendant Gittleman sent an email to an investor reiterating that Toggle was the core of AT&T's enterprise mobility strategy and adding that all of OpenPeak's "major partners have now completed their full launch of the products in late Q4 and we are already seeing growing pipelines, customer wins and revenue." ¶113. This email was misleading because Toggle had not become the "core" of AT&T's strategy and the identified companies had not adopted the Sector ecosystem as the standard for their enterprise mobile security. To the contrary, OpenPeak's customers had experienced major problems with ADAM, including AT&T, who experienced problems with Toggle's split-billing feature and Blackberry, who experienced similar problems. ¶¶112-113.

(c)    On or about February 11, 2014, Defendants Gittleman and Barclay represented to Hercules that OpenPeak would have 864,000 Toggle license sales to AT&T in 2014 alone, equating to $43 million in revenue for 2014. This was misleading because, in actuality, total sales for 2014 were $16.5 million, less than half of the $43 million projected for AT&T alone. ¶121(b). This projection was based on unsupportable assumptions and was not realistic. Further, Defendant Gittleman lacked a reasonable basis to make this projection because ADAM did not work as intended, customers were dissatisfied with ADAM and complained about the quality of the product, and there were extremely low activation numbers with no reason to expect any meaningful change. ¶¶117-120, 122, 124.

(d)    Defendant Gittleman claimed to stakeholders that the Company's intellectual property could be sold for $200-$300 million and was extremely marketable to companies such as BlackBerry, VMware and others. A material factor inducing investors to get involved with OpenPeak was the near guarantee by OpenPeak that its patent portfolio could be sold for $200 million or greater. ¶125. Contrary to Gittleman's misleading representations, however, OpenPeak's

intellectual property was worth merely a fraction of the value represented and was not original or propriety to OpenPeak.  ¶¶126-127.  In fact, Citrix valued OpenPeak's intellectual property at no more than a maximum of $2 million, which was in line with the amount OpenPeak ultimately sold the portfolio for.  ¶126.

(e)    In 2015, Defendant Gittleman represented to an investor that OpenPeak had a firm offer from VMware for $180 million.  ¶140.  This, however, was untrue, and VMware had made no such offer.  *Id.*

(f)    Defendant Gittleman was also involved in a scheme to manipulate OpenPeak's financial results to make the Company appear more attractive to potential investors or buyers.  ¶128.  In addition to falsely reporting the Company's historical financials (¶129) and improperly recording service revenue (¶138), Defendants Gittleman, Barclay and Kwon worked to back out $8 million of revenue from a prepayment by AT&T for the transfer of 225,000 licenses from OpenPeak.  ¶130.  The decision to deceptively reuse the previously recorded revenue was in order to make OpenPeak appear more appealing to a potential investor or buyer.  ¶¶133-134.

148.    As a direct and proximate result of Defendant Gittleman's foregoing breaches of fiduciary obligations, the Company had suffered substantial damages, not only monetary, but also to its corporate image and goodwill, which ultimately led to the Company filing for bankruptcy.

149.    Plaintiff has no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duty of Disclosure and Candor
### (Against Defendant Barclay)

150.    To state a claim for a breach of the duty to disclose, Plaintiff must (1) identify a material statement or representation in a communication contemplating stakeholder action (2) that is false.

151.    As described in detail herein, Defendant Barclay was a fiduciary of the Company and had a fiduciary duty to ensure that OpenPeak disseminated accurate, truthful and complete information to its stakeholders.  Defendant Barclay knowingly caused the Company to disseminate to its stakeholders materially misleading and inaccurate information about the condition and performance of the Company, including in connection with his attempts to obtain investments in the Company (¶¶32-34), as described below:

(a)    On January 13, 2014, Defendant Barclay emailed investor Hercules concerning OpenPeak's December 2013 launch of the latest version of Toggle and falsely stated that, "it is already off to an amazing start.  It was clear this week that Toggle has become the core of . . . [AT&T's] enterprise mobility strategy."  He added that the latest version of Toggle allowed for a "secondary voice line for business use as well as bill[ed] all business data traffic directly to the enterprise.  This is a game changer for AT&T and none of our competitors can do this!!!"  The email also touted that "AT&T, Blackberry and Deutsche Telekom have all adopted [OpenPeak's Sector ecosystem] as the standard for enterprise mobile security."   ¶111.   Defendant Barclay's January 13, 2014 statements were misleading because Toggle had not become the "core" of AT&T's strategy and the identified companies had not adopted the Sector ecosystem as the standard for their enterprise mobile security.  To the contrary, OpenPeak's customers had experienced major problems with ADAM, including AT&T, who experienced problems with Toggle's split-billing feature and Blackberry, who experienced similar problems.  In fact, during sworn deposition testimony regarding this document, Barclay could not remember if Toggle was even usable at this time.  ¶112.

(b)    On April 28, 2014, Defendant Barclay represented by email to April Young of Hercules that, "revenue from AT&T and BlackBerry have been going fantastic!"  ¶114.  This email was misleading because OpenPeak's customers had experienced major problems with ADAM,

including AT&T, who experienced problems with Toggle's split-billing feature and Blackberry, who experienced similar problems.  In fact, during sworn deposition testimony regarding this document, Barclay could not remember if Toggle was even usable at this time.  ¶¶112, 114.

(c)     On October 8, 2015, Defendant Barclay emailed an investor regarding a deal with the United States Marine Corps, stating, in pertinent part, "[l]ast week [OpenPeak] also closed a huge deal with the U.S Marine Corp[s] as the platform to deliver secure applications and data to up to 300K personnel."  This was misleading because, in reality, the USMC simply agreed to test ADAM under an "enterprise pilot" program for 220 licenses.  ¶115.

(d)     On or about January 22, 2014, Defendant Barclay emailed Hercules representatives and attached a January 2014 Executive Overview which made statements about OpenPeak's software, business opportunities, and revenues.  The overview forecasted, for 2014, total revenue of $72,928,000, gross profit of $64,916,000, EBITDA of $35,295,000, and millions of license sales.  This was misleading because OpenPeak's revenues from 2012-2016 *combined* did not even come close to $72.9 million, and OpenPeak did not come close to millions of license activations.  ¶121(a).  This projection was based on unsupportable assumptions and was not realistic. Further, Defendant Barclay lacked a reasonable basis to make this projection because ADAM did not work as intended, customers were dissatisfied with ADAM and complained about the quality of the product, and there were extremely low activation numbers with no reason to expect any meaningful change.  ¶¶117-120, 122, 124.

(e)     On or about February 11, 2014, Defendants Gittleman and Barclay represented to Hercules that OpenPeak would have 864,000 Toggle license sales to AT&T in 2014 alone, equating to $43 million in revenue for 2014.  This was misleading because, in actuality, total sales for 2014 were $16.5 million, less than half of the $43 million projected for AT&T alone.

¶121(b).  This projection was based on unsupportable assumptions and was not realistic.  Further, Defendant Barclay lacked a reasonable basis to make this projection because ADAM did not work as intended, customers were dissatisfied with ADAM and complained about the quality of the product, and there were extremely low activation numbers with no reason to expect any meaningful change.  ¶¶117-120, 122, 124.

(f)    On January 20, 2015, Defendant Barclay emailed an investor and provided OpenPeak's "preliminary draft 2015 forecast."  According to the forecast, OpenPeak projected total revenues of $6.6 million in the first quarter of 2015, $13.2 million in the second quarter of 2015, $19.1 million in the third quarter of 2015, and $25.2 million in the fourth quarter of 2015.  In reality, this was misleading because OpenPeak barely cleared $10 million in revenue during all of 2015.  ¶123.  This projection was based on unsupportable assumptions and was not realistic.  Further, Defendant Barclay lacked a reasonable basis to make this projection because ADAM did not work as intended, customers were dissatisfied with ADAM and complained about the quality of the product, and there were extremely low activation numbers with no reason to expect any meaningful change.  ¶¶117-120, 122, 124.

(g)    Defendant Barclay was also involved in a scheme to manipulate OpenPeak's financial results to make the Company appear more attractive to potential investors or buyers.  ¶128.  In addition to falsely reporting the Company's historical financials (¶129), and improperly recording service revenue (¶138), Defendants Gittleman, Barclay and Kwon worked to back out $8 million of revenue from a prepayment by AT&T for the transfer of 225,000 licenses from OpenPeak.  ¶130.  The decision to deceptively reuse the previously recorded revenue was in order to make OpenPeak appear more appealing to a potential investor or buyer.  ¶¶133-134.

152.    As a direct and proximate result of Defendant Barclay's foregoing breaches of fiduciary obligations, the Company had suffered substantial damages, not only monetary, but also to its corporate image and goodwill, which ultimately led to the Company filing for bankruptcy.

153.    Plaintiff has no adequate remedy at law.

### COUNT III

### Breach of Fiduciary Duty of Disclosure and Candor
### (Against Defendant Kwon)

154.    To state a claim for a breach of the duty to disclose, Plaintiff must (1) identify a material statement or representation in a communication contemplating stakeholder action (2) that is false.

155.    As described in detail herein, Defendant Kwon was a fiduciary of the Company and had a fiduciary duty to ensure that OpenPeak disseminated accurate, truthful and complete information to its stakeholders.  Defendant Kwon knowingly caused the Company to disseminate to its stakeholders materially misleading and inaccurate information about the condition and performance of the Company, including in connection with his attempts to obtain investments in the Company (¶¶32-34), as described below:

(a)    Defendant Kwon was involved in a scheme to manipulate OpenPeak's financial results to make the Company appear more attractive to potential investors or buyers.  ¶128. In addition to falsely reporting the Company's historical financials (¶129), and improperly recording service revenue (¶138), Defendants Gittleman, Barclay and Kwon worked to back out $8 million of revenue from a prepayment by AT&T for the transfer of 225,000 licenses from OpenPeak.  ¶130. The decision to deceptively reuse the previously recorded revenue was in order to make OpenPeak appear more appealing to a potential investor or buyer.  ¶¶133-134.

156.    As a direct and proximate result of Defendant Kwon's foregoing breaches of fiduciary obligations, the Company had suffered substantial damages, not only monetary, but also to its corporate image and goodwill, which ultimately led to the Company filing for bankruptcy.

157.    Plaintiff has no adequate remedy at law.

### COUNT IV

### Waste of Corporate Assets
### (Against Defendant Gittleman)

158.    To state a claim for waste of corporate assets, Plaintiff must allege: (1) facts showing that OpenPeak received no consideration for the spending; or (2) a transfer of corporate assets that served no corporate purpose.

159.    Defendant Gittleman owed OpenPeak the obligation to avoid wasting OpenPeak's assets.  Defendant Gittleman allowed for, and/or participated in, lavish and wasteful spending, for this own benefit or for the benefit of other employees, as described below:

(a)    Defendant Gittleman drew excessive salaries for three years preceding the OpenPeak bankruptcy.  Based on available records, Gittleman collected, as salary, $475,000 in 2015, likely collected a similar amount in 2014, and was set to make a similar amount in 2016.  ¶¶96-97. Gittleman's salary was a waste of corporate assets because he was paid in excess of the legitimate services he was providing because: (1) the Company did not have a product that worked (¶¶39-62); (2) the Company was not generating any revenue and constantly needed to seek additional funds from investors to keep the Company afloat (¶¶32-38); and (3) the Company had written down the value of its ADAM software to $0 in early 2014, admitting its product was worthless (¶¶63-69).

(b)    Despite the fact that OpenPeak determined its ADAM Java software was worthless, and the Company had made the decision to switch to the ADAM PHP software (¶¶63-69), Defendant Gittleman continued to waste corporate funds by employing and paying his friends to

continue working on the Java software, even though those salaries did not serve any legitimate business purpose.  ¶102.

(c)    Defendant Gittleman wasted corporate funds by spending up to $75,000 on a villa at the MGM Mansion in Las Vegas during the CES.  ¶100.  The MGM Mansion is reserved for the "highest of rollers" and has 29 individually designed Mediterranean themed villas ranging from 2,400 square feet to 12,000 square feet.  Even though the villa could accommodate numerous guests, only Gittleman and his secretary, Stacey Bradford, would stay there.  *Id.*  Defendant Gittleman caused OpenPeak to waste additional money on separate rooms for other OpenPeak employees in the regular portion of the MGM hotel, even though they could have comfortably stayed in villa.  ¶101. This wasteful spending occurred in both 2014 and 2015.  *Id.*

160.    Defendant Gittleman breached his obligations to OpenPeak by spending, or allowing spending, on unnecessary, non-business related items, resulting in a needless and wasteful use of corporate assets.  As a direct and proximate result of the waste of corporate assets by Defendant Gittleman, OpenPeak has been damaged.  Further, as a result of his waste of corporate assets, Defendant Gittleman is liable to the Company.

161.    Plaintiff has no adequate remedy at law.

## COUNT V

### Waste of Corporate Assets
### (Against Defendant Barclay)

162.    To state a claim for waste of corporate assets, Plaintiff must allege: (1) facts showing that OpenPeak received no consideration for the spending; or (2) a transfer of corporate assets that served no corporate purpose.

163.   Defendant Barclay owed OpenPeak the obligation to avoid wasting OpenPeak's assets. Defendant Barclay allowed for, and/or participated in, lavish and wasteful spending, for this own benefit or for the benefit of other employees, as described below:

(a)   Defendant Barclay drew excessive salaries for three years preceding the OpenPeak bankruptcy. Based on available records, Barclay collected, as salary, $350,000 in 2015, likely collected a similar amount in 2014, and was set to make a similar amount in 2016. ¶¶96-97. Barclay's salary was a waste of corporate assets because he was paid in excess of the legitimate services he was providing because: (1) the Company did not have a product that worked (¶¶39-62); (2) the Company was not generating any revenue and constantly needed to seek additional funds from investors to keep the Company afloat (¶¶31-38); and (3) the Company had written down the value of its ADAM software to $0 in early 2014, admitting its product was worthless (¶¶63-69).

(b)   Despite the fact that OpenPeak determined its ADAM Java software was worthless, and the Company had made the decision to switch to the ADAM PHP software (¶¶63-69), Defendant Gittleman continued to waste corporate funds by employing and paying his friends to continue working on the Java software, even though those salaries did not serve any legitimate business purpose. ¶102. Defendant Barclay is liable for allowing this conduct to continue while he was an officer of OpenPeak.

164.   Defendant Barclay breached his obligations to OpenPeak by spending, or allowing spending, on unnecessary, non-business related items, resulting in a needless and wasteful use of corporate assets. As a direct and proximate result of the waste of corporate assets by Defendant Barclay, OpenPeak has been damaged. Further, as a result of his waste of corporate assets, Defendant Barclay is liable to the Company.

165.   Plaintiff has no adequate remedy at law.

## COUNT VI

### Waste of Corporate Assets
### (Against Defendant Kwon)

166.    To state a claim for waste of corporate assets, Plaintiff must allege: (1) facts showing that OpenPeak received no consideration for the spending; or (2) a transfer of corporate assets that served no corporate purpose.

167.    Defendant Kwon owed OpenPeak the obligation to avoid wasting OpenPeak's assets. Defendant Kwon allowed for, and/or participated in, lavish and wasteful spending, for this own benefit or for the benefit of other employees, as described below:

(a)    Defendant Kwon drew excessive salaries for three years preceding the OpenPeak bankruptcy. Based on available records, Kwon collected, as salary, $360,000 in 2015, likely collected a similar amount in 2014, and was set to make a similar amount in 2016. ¶¶96-97. Kwon's salary was a waste of corporate assets because he was paid in excess of the legitimate services he was providing because: (1) the Company did not have a product that worked (¶¶39-62); (2) the Company was not generating any revenue and constantly needed to seek additional funds from investors to keep the Company afloat (¶¶31-38); and (3) the Company had written down the value of its ADAM software to $0 in early 2014, admitting its product was worthless (¶¶63-69).

(b)    Despite the fact that OpenPeak determined its ADAM Java software was worthless, and the Company had made the decision to switch to the ADAM PHP software (¶¶63-69), Defendant Gittleman continued to waste corporate funds by employing and paying his friends to continue working on the Java software, even though those salaries did not serve any legitimate business purpose. ¶102. Defendant Kwon is liable for allowing this conduct to continue while he was an officer of OpenPeak.

168.    Defendant Kwon breached his obligations to OpenPeak by spending, or allowing spending, on unnecessary, non-business related items, resulting in a needless and wasteful use of corporate assets.  As a direct and proximate result of the waste of corporate assets by Defendant Kwon, OpenPeak has been damaged.  Further, as a result of his waste of corporate assets, Defendant Kwon is liable to the Company.

169.    Plaintiff has no adequate remedy at law.

### COUNT VII

### Waste of Corporate Assets
### (Against Defendant Hill)

170.    To state a claim for waste of corporate assets, Plaintiff must allege: (1) facts showing that OpenPeak received no consideration for the spending; or (2) a transfer of corporate assets that served no corporate purpose.

171.    Defendant Hill owed OpenPeak the obligation to avoid wasting OpenPeak's assets. Defendant Hill allowed for, and/or participated in, lavish and wasteful spending, for this own benefit or for the benefit of other employees, as described below:

(a)    Defendant Hill drew excessive salaries for three years preceding the OpenPeak bankruptcy.  Based on available records, Hill collected, as salary, $475,000 in 2015, likely collected a similar amount in 2014, and was set to make a similar amount in 2016.  ¶¶96-97. Hill's salary was a waste of corporate assets because he was paid in excess of the legitimate services he was providing because: (1) the Company did not have a product that worked (¶¶39-62); (2) the Company was not generating any revenue and constantly needed to seek additional funds from investors to keep the Company afloat (¶¶31-38); and (3) the Company had written down the value of its ADAM software to $0 in early 2014, admitting its product was worthless (¶¶63-69).

(b)      Despite the fact that OpenPeak determined its ADAM Java software was

worthless, and the Company had made the decision to switch to the ADAM PHP software (¶¶63-69),

Defendant Gittleman continued to waste corporate funds by employing and paying his friends to

continue working on the Java software, even though those salaries did not serve any legitimate

business purpose. ¶102. Defendant Hill is liable for allowing this conduct to continue while he was

an officer of OpenPeak.

172.     Defendant Hill breached his obligations to OpenPeak by spending, or allowing

spending, on unnecessary, non-business related items, resulting in a needless and wasteful use of

corporate assets.  As a direct and proximate result of the waste of corporate assets by Defendant Hill,

OpenPeak has been damaged.  Further, as a result of his waste of corporate assets, Defendant Hill is

liable to the Company.

173.     Plaintiff has no adequate remedy at law.

## COUNT VIII

### Fraudulent Transfer Under 11 U.S.C. §§548(a)(1), 544(b), 550(a)
### (Against Defendant Gittleman)

174.     To state a claim for federal fraudulent transfer, Plaintiff must allege that the debtor:

(1) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(2) was insolvent on the date that such transfer was made or such obligation was incurred, or became

insolvent as a result of such transfer or obligation; (3) was engaged in business or a transaction, or

was about to engage in business or a transaction, for which any property remaining with the debtor

was an unreasonably small capital; (4) intended to incur, or believed that the debtor would incur,

debts that would be beyond the debtor's ability to pay as such debts matured; or (5) made such

transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an

insider, under an employment contract and not in the ordinary course of business.

175.    Any payments made to Defendant Gittleman under an employment agreement or otherwise made to him, or on his behalf, constitutes a transfer of interest of OpenPeak property. For instance, based on available records, Gittleman collected, as salary, $475,000 in 2015, likely collected a similar amount in 2014, and was set to make a similar amount in 2016. ¶¶96-97.

176.    Defendant Gittleman also, as detailed herein, engaged in a course of conduct by which he used OpenPeak funds to pay for his personal expenses accumulated on his American Express credit cards. Defendant Gittleman's monthly American Express charges regularly exceeded $50,000 and exceeded $100,000 on numerous occasions. ¶103.

177.    Defendant Gittleman also caused the Company to pay salaries to his friends despite there being no legitimate business purpose for their work, including those who continued developing the Java version of ADAM, after its value was written down to $0. ¶102.

178.    OpenPeak did not receive reasonably equivalent value or fair consideration in exchange for such transfers.

179.    Defendant Gittleman intended to hinder, delay or defraud OpenPeak's creditors by making such transfers, to his own benefit, without consideration to OpenPeak.

180.    At the time of such transfers: (i) OpenPeak was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with OpenPeak was an unreasonably small capital; and/or (ii) OpenPeak intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

181.    At the time of such transfers, dating back two years before the bankruptcy petition, OpenPeak was insolvent, or became insolvent as a result of the obligations incurred or the payments made.

182.    At the time of such transfers, Defendant Gittleman had reasonable cause to believe that OpenPeak was insolvent.

183.    Consequently, such transfers were fraudulent as to then present and future creditors.

184.    Defendant Gittleman should be required to return the value he received pursuant to such fraudulent transfers.

## COUNT IX

### Fraudulent Transfer Under N.J. Stat. §25:2-20 *et seq.*
### (Against Defendant Gittleman)

185.    To state a claim under New Jersey fraudulent transfer law, Plaintiff must allege a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation, without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

186.    Any payments made to Defendant Gittleman under an employment agreement or otherwise made to him, or on his behalf, constitutes a transfer of interest of OpenPeak property.  For instance, based on available records, Gittleman collected, as salary, $475,000 in 2015, likely collected a similar amount in 2013 and 2014, and was set to make a similar amount in 2016. ¶¶96-97.

187.    Defendant Gittleman also, as detailed herein, engaged in a course of conduct by which he used OpenPeak funds to pay for his personal expenses accumulated on his American

Express credit cards.  Defendant Gittleman's monthly American Express charges regularly exceeded $50,000 and exceeded $100,000 on numerous occasions.  ¶103.

188.     Defendant Gittleman also caused the Company to pay salaries to his friends despite there being no legitimate business purpose for their work, including those who continued developing the Java version of ADAM, after its value was written down to $0.  ¶102.

189.     Defendant Gittleman also  received a September 22, 2013 Full-Recourse Promissory Loan in the amount of $130,342.40, which remains unpaid.  ¶99.

190.     OpenPeak did not receive reasonably equivalent value or fair consideration in exchange for such transfers.

191.     At the time of such transfers: (i) OpenPeak was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with OpenPeak was an unreasonably small capital; and/or (ii) OpenPeak intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

192.     Consequently, such transfers were fraudulent as to then present and future creditors.

193.     Defendant Gittleman should be required to return the value he received pursuant to such fraudulent transfers.

## COUNT X

### Fraudulent Transfer Under 11 U.S.C. §§548(a)(1), 544(b), 550(a)
### (Against Defendant Barclay)

194.     To state a claim for federal fraudulent transfer, Plaintiff must allege that the debtor: (1) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (2) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (3) was engaged in business or a transaction, or

was about to engage in business or a transaction, for which any property remaining with the debtor

was an unreasonably small capital; (4) intended to incur, or believed that the debtor would incur,

debts that would be beyond the debtor's ability to pay as such debts matured; or (5) made such

transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an

insider, under an employment contract and not in the ordinary course of business.

195.    Any payments made to Defendant Barclay under an employment agreement or

otherwise made to him, or on his behalf, constitutes a transfer of interest of OpenPeak property.  For

instance, based on available records, Barclay collected, as salary, $350,000 in 2015, likely collected

a similar amount in 2014, and was set to make a similar amount in 2016.  ¶¶96-97.

196.    Defendant Barclay also, as detailed herein, engaged in a course of conduct by which

he used OpenPeak funds to pay for his personal expenses accumulated on his American Express

credit cards.  ¶103.

197.    Defendant Barclay allowed the Company to pay salaries to Gittleman's friends

despite there being no legitimate business purpose for their work, including those who continued

developing the Java version of ADAM.  ¶102.

198.    OpenPeak did not receive reasonably equivalent value or fair consideration in

exchange for such transfers.

199.    Defendant Barclay intended to hinder, delay or defraud OpenPeak's creditors by

making such transfers, to his own benefit, without consideration to OpenPeak.

200.    At the time of such transfers: (i) OpenPeak was engaged in business or a transaction,

or was about to engage in business or a transaction, for which any property remaining with

OpenPeak was an unreasonably small capital; and/or (ii) OpenPeak intended to incur, or believed or

reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

201.    At the time of such transfers, dating back two years before the bankruptcy petition, OpenPeak was insolvent, or became insolvent as a result of the obligations incurred or the payments made.

202.    At the time of such transfers, Defendant Barclay had reasonable cause to believe that OpenPeak was insolvent.

203.    Consequently, such transfers were fraudulent as to then present and future creditors.

204.    Defendant Barclay should be required to return the value he received pursuant to such fraudulent transfers.

## COUNT XI

### Fraudulent Transfer Under N.J. Stat. §25:2-20 *et seq.*
### (Against Defendant Barclay)

205.    To state a claim under New Jersey fraudulent transfer law, Plaintiff must allege a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation, without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

206.    Any payments made to Defendant Barclay under an employment agreement or otherwise made to him, or on his behalf, constitutes a transfer of interest of OpenPeak property.  For

instance, based on available records, Barclay collected, as salary, $350,000 in 2015, likely collected

a similar amount in 2013 and 2014, and was set to make a similar amount in 2016.  ¶¶96-97.

207.   Defendant Barclay also, as detailed herein, engaged in a course of conduct by which

he used OpenPeak funds to pay for his personal expenses accumulated on his American Express

credit cards.  ¶103.

208.   Defendant Barclay allowed the Company to pay salaries to Gittleman's friends

despite there being no legitimate business purpose for their work, including those who continued

developing the Java version of ADAM.  ¶102.

209.   OpenPeak did not receive reasonably equivalent value or fair consideration in

exchange for such transfers.

210.   At the time of such transfers: (i) OpenPeak was engaged in business or a transaction,

or was about to engage in business or a transaction, for which any property remaining with

OpenPeak was an unreasonably small capital; and/or (ii) OpenPeak intended to incur, or believed or

reasonably should have believed that it would incur, debts that would be beyond its ability to pay as

such debts matured.

211.   Consequently, such transfers were fraudulent as to then present and future creditors.

212.   Defendant Barclay should be required to return the value he received pursuant to such

fraudulent transfers.

## COUNT XII

### Fraudulent Transfer Under 11 U.S.C. §§548(a)(1), 544(b), 550(a)
### (Against Defendant Kwon)

213.   To state a claim for federal fraudulent transfer, Plaintiff must allege that the debtor:

(1) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(2) was insolvent on the date that such transfer was made or such obligation was incurred, or became

insolvent as a result of such transfer or obligation; (3) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (4) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or (5) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

214.    Any payments made to Defendant Kwon under an employment agreement or otherwise made to him, or on his behalf, constitutes a transfer of interest of OpenPeak property.  For instance, based on available records, Kwon collected, as salary, $360,000 in 2015, likely collected a similar amount in 2014, and was set to make a similar amount in 2016.  ¶¶96-97.

215.    Defendant Kwon also, as detailed herein, engaged in a course of conduct by which he used OpenPeak funds to pay for his personal expenses accumulated on his American Express credit cards.  ¶103.

216.    Defendant Kwon allowed the Company to pay salaries to Gittleman's friends despite there being no legitimate business purpose for their work, including those who continued developing the Java version of ADAM.  ¶102.

217.    OpenPeak did not receive reasonably equivalent value or fair consideration in exchange for such transfers.

218.    Defendant Kwon intended to hinder, delay or defraud OpenPeak's creditors by making such transfers, to his own benefit, without consideration to OpenPeak.

219.    At the time of such transfers: (i) OpenPeak was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with OpenPeak was an unreasonably small capital; and/or (ii) OpenPeak intended to incur, or believed or

reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

220.    At the time of such transfers, dating back two years before the bankruptcy petition, OpenPeak was insolvent, or became insolvent as a result of the obligations incurred or the payments made.

221.    At the time of such transfers, Defendant Kwon had reasonable cause to believe that OpenPeak was insolvent.

222.    Consequently, such transfers were fraudulent as to then present and future creditors.

223.    Defendant Kwon should be required to return the value he received pursuant to such fraudulent transfers.

## COUNT XIII

### Fraudulent Transfer Under N.J. Stat. §25:2-20 *et seq.*
### (Against Defendant Kwon)

224.    To state a claim under New Jersey fraudulent transfer law, Plaintiff must allege a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation, without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

225.    Any payments made to Defendant Kwon under an employment agreement or otherwise made to him, or on his behalf, constitutes a transfer of interest of OpenPeak property.  For

instance, based on available records, Kwon collected, as salary, $360,000 in 2015, likely collected a similar amount in 2013 and 2014, and was set to make a similar amount in 2016.  ¶¶96-97.

226.    Defendant Kwon also, as detailed herein, engaged in a course of conduct by which he used OpenPeak funds to pay for his personal expenses accumulated on his American Express credit cards.  ¶103.

227.    Defendant Kwon allowed the Company to pay salaries to Gittleman's friends despite there being no legitimate business purpose for their work, including those who continued developing the Java version of ADAM.  ¶102.

228.    Defendant Kwon also received a September 22, 2013 Full-Recourse Promissory in the amount of $72,282.64, that remains unpaid.  ¶99.

229.    OpenPeak did not receive reasonably equivalent value or fair consideration in exchange for such transfers.

230.    At the time of such transfers: (i) OpenPeak was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with OpenPeak was an unreasonably small capital; and/or (ii) OpenPeak intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

231.    Consequently, such transfers were fraudulent as to then present and future creditors.

232.    Defendant Kwon should be required to return the value he received pursuant to such fraudulent transfers.

## COUNT XIV

### Fraudulent Transfer Under 11 U.S.C. §§548(a)(1), 544(b), 550(a)
### (Against Defendant Hill)

233.     To state a claim for federal fraudulent transfer, Plaintiff must allege that the debtor:

(1) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(2) was insolvent on the date that such transfer was made or such obligation was incurred, or became

insolvent as a result of such transfer or obligation; (3) was engaged in business or a transaction, or

was about to engage in business or a transaction, for which any property remaining with the debtor

was an unreasonably small capital; (4) intended to incur, or believed that the debtor would incur,

debts that would be beyond the debtor's ability to pay as such debts matured; or (5) made such

transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an

insider, under an employment contract and not in the ordinary course of business.

234.     Any payments made to Defendant Hill under an employment agreement or otherwise

made to him, or on his behalf, constitutes a transfer of interest of OpenPeak property.  For instance,

based on available records, Hill collected, as salary, $475,000 in 2015, likely collected a similar

amount in 2014, and was set to make a similar amount in 2016.  ¶¶96-97.

235.     Defendant Hill also, as detailed herein, engaged in a course of conduct by which he

used OpenPeak funds to pay for his personal expenses accumulated on his American Express credit

cards.  ¶103.

236.     Defendant Hill allowed the Company to pay salaries to Gittleman's friends despite

there being no legitimate business purpose for their work, including those who continued developing

the Java version of ADAM.  ¶102.

237.     OpenPeak did not receive reasonably equivalent value or fair consideration in

exchange for such transfers.

238.    Defendant Hill intended to hinder, delay or defraud OpenPeak's creditors by making such transfers, to his own benefit, without consideration to OpenPeak.

239.    At the time of such transfers: (i) OpenPeak was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with OpenPeak was an unreasonably small capital; and/or (ii) OpenPeak intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

240.    At the time of such transfers, dating back two years before the bankruptcy petition, OpenPeak was insolvent, or became insolvent as a result of the obligations incurred or the payments made.

241.    At the time of such transfers, Defendant Hill had reasonable cause to believe that OpenPeak was insolvent.

242.    Consequently, such transfers were fraudulent as to then present and future creditors.

243.    Defendant Hill should be required to return the value he received pursuant to such fraudulent transfers.

## COUNT XV

### Fraudulent Transfer Under N.J. Stat. §25:2-20 *et seq.*
### (Against Defendant Hill)

244.    To state a claim under New Jersey fraudulent transfer law, Plaintiff must allege a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation, without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to

the business or transaction; or (2) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

245.    Any payments made to Defendant Hill under an employment agreement or otherwise made to him, or on his behalf, constitutes a transfer of interest of OpenPeak property.  For instance, based on available records, Hill collected, as salary, $475,000 in 2015, likely collected a similar amount in 2013 and 2014, and was set to make a similar amount in 2016.  ¶¶96-97.

246.    Defendant Hill also, as detailed herein, engaged in a course of conduct by which he used OpenPeak funds to pay for his personal expenses accumulated on his American Express credit cards.  ¶103.

247.    Defendant Hill allowed the Company to pay salaries to Gittleman's friends despite there being no legitimate business purpose for their work, including those who continued developing the Java version of ADAM.  ¶102.

248.    OpenPeak did not receive reasonably equivalent value or fair consideration in exchange for such transfers.

249.    At the time of such transfers: (i) OpenPeak was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with OpenPeak was an unreasonably small capital; and/or (ii) OpenPeak intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

250.    Consequently, such transfers were fraudulent as to then present and future creditors.

251.    Defendant Hill should be required to return the value he received pursuant to such fraudulent transfers.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Against the Defendants and in favor of the Company for the amount of damages

sustained by OpenPeak as a result of the Defendants' wrongful conduct;

B.      Awarding to OpenPeak restitution from the Defendants, and ordering disgorgement of

all profits, benefits and other compensation obtained by Defendants;

C.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable

attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.      Granting such other and further relief as the Court deems just and proper.

DATED:  February 5, 2021                 FORMAN HOLT
                                         MICHAEL E. HOLT


                                         _____
                                                */s/ Michael E. Holt*
                                         MICHAEL E. HOLT

                                         365 West Passaic Street, Suite 400
                                         Rochelle Park, New Jersey 07662
                                         Telephone:  201/845-1000
                                         Facsimile:  201/655-6650

                                         *Attorney for Charles M. Forman Chapter 7*
                                         *Trustee*

                                         ROBBINS GELLER RUDMAN & DOWD LLP
                                         SAMUEL H. RUDMAN
                                         EVAN J. KAUFMAN*
                                         WILLIAM J. GEDDISH*
                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         Facsimile:  631/367-1173
                                         srudman@rgrdlaw.com
                                         ekaufman@rgrdlaw.com
                                         wgeddish@rgrdlaw.com

                                         * admitted *pro hac vice*

                                         *Special Litigation Counsel for Trustee*